**Revised January 20, 1999**

**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**
_____

No. 97-20602
_____

PATRICE SHARP,

Plaintiff-Appellee,

VERSUS

CITY OF HOUSTON; ET AL

Defendants,

CITY OF HOUSTON,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Texas
_____

January 12, 1999

Before KING, SMITH, and STEWART, Circuit Judges.

JERRY E. SMITH, Circuit Judge:


The City of Houston appeals a judgment entered on a jury verdict in favor of Patrice Sharp, a former Houston Police Department ("HPD") officer, for sexual harassment and retaliation. Finding no reversible error, we affirm.

Sharp was one of about fourteen officers assigned to Mounted Patrol, an elite horse-mounted unit stationed several miles from downtown Houston and police headquarters. Mounted Patrol maintained a strict paramilitary chain of command. There were two sergeants: Edgar Bice, who was Sharp's immediate supervisor, and Jimmy Brown. In 1991, Lieutenant Wayne Hankins was given charge of Mounted Patrol, supervising the two sergeants. He reported to the Special Operations Commander, Captain Dale Brown, who reported to Assistant Chief Dennis Stormski, who reported to Chief Sam Nuchia.

Everyone assigned to Mounted Patrol, including Hankins and the sergeants, was based at Mounted Patrol headquarters. The persons with higher levels of authority, however, were located at HPD headquarters downtown. Because of the unit's physical isolation, and because its duties did not overlap significantly with those of other units, Hankins retained almost absolute control over the unit's operations, subject only to minimal supervision by Captain Brown.

Shortly after Hankins took charge, he and Bice began sexually harassing Sharp, making frequent and demeaning comments about her body, making her the object of lewd jokes and gestures, and generally mistreating her in a manner that was not directed at male officers. On one occasion, Bice announced in front of over one

hundred officers and police cadets that Sharp "needs to be in a wet T-shirt contest." He often referred to Sharp's breasts as "headlights" and, on one occasion, as Sharp walked toward him and several other officers, he yelled, "I see those headlights coming!"

When Sharp would bend over to pick up equipment, Bice, while swiveling his hips, would shout out, "hold that position, gal." When Sharp requested time off, Bice often joked that he had keys to a motel room where they could go to "discuss the matter." He often commented that the couch in his office folded out into a bed, and invited her to come in and close the door. He once told Sharp that he would approve her vacation request if she brought back pictures of herself on a nude beach, and once suggested that Sharp and another female officer tell others that they had engaged in a sexual threesome with him.

Hankins not only failed to stop Bice's harassment but engaged in harassment himself. His favorite occasion for harassment was the daily roll call, at which all officers were required to be present. He often told filthy jokes at roll call, which derived their adolescent, shock-value "humor" from their graphic references to female and male sex organs, breasts, excretory functions, masturbation, and various sex acts.

On one occasion, during roll call, Hankins walked up to Sharp and unzipped his pants, placing his crotch inches from her face. He capped off the "joke" by making a reference to oral sex. When Sharp asked job-related questions, on several occasions Hankins

3

grabbed his crotch and shook it, inviting her to "chew on this." Almost universally, Hankins and Bice made their lewd jokes, comments, and gestures in the presence of other officers.

Although Sharp made it apparent that she did not find the jokes or comments funny, and that she did not care for the treatment Hankins and Bice afforded her, she never formally complained to Bice, Hankins, or Captain Brown, nor to HPD's Internal Affairs Division ("IAD") or the mayor's affirmative action office. Because her direct supervisor and his supervisor were the ones harassing her, she believed it would have been useless to complain to them. She was chilled from going to IAD, and she presented evidence that any officer who complained about another officer inevitably suffered for it, socially and professionally.

Hankins's and Bice's misconduct came to light in 1993 only as a result of an internal investigation.[1] When Sharp was ordered to provide information as part of that inquiry, she told the investigator of Hankins's and Bice's harassment. That investigation soon was upgraded to a full IAD review, and Hankins and Bice ultimately were found to have engaged in sexual harassment and other HPD rules violations.

As soon as the investigation of Bice and Hankins became a full-blown IAD matter, they were transferred from Mounted Patrol

---

[1] That investigation was initiated when Bice turned in another officer for insubordination, and that officer counter-charged various incidents of misconduct against Bice and Hankins.

4

pending the investigation's conclusion. Those transfers later became permanent, and both were suspended without pay for ninety days. Sergeant Brown was reprimanded for failing to report the misconduct of which he had been aware and for initially denying that the harassment had occurred.

During and after her participation in the IAD investigation of Bice and Hankins, Sharp was subjected to retaliation by fellow officers for breaking the "code of silence," a custom within HPD of punishing officers who complain of other officers' misconduct or who truthfully corroborate allegations of misconduct. Specifically, Sharp alleged that

>    (1) she was shunned, badmouthed, and socially ostracized by her fellow officers;
>
>    (2) someone removed her name from an overtime sign-up sheet at Mounted Patrol;
>
>    (3) her tack was vandalized on one occasion in such a way that it could have caused her injury;
>
>    (4) her Mounted Patrol colleagues did not immediately come to her assistance when informed that she had a car accident on the way to work;
>
>    (5) a roll call was held outside her presence; and
>
>    (6) HPD and IAD did not punish Hankins or Bice, nor the officers who came to their defense against Sharp's allegations, severely enough.

Sharp sought relief from Sergeant Chapman, the new day shift supervisor at Mounted Patrol. She apprised him of the acts of retaliation taken by her colleagues, but he took no corrective action. Although he dutifully reported some of the retaliation to

5

his superiors, he often responded to Sharp by minimizing the retaliationSS"laughing it off" and telling her not to worry about itSSand he even openly blamed her for embarrassing the unit and for causing strife within it.[2]

Nuchia personally spoke with Sharp, expressed his awareness of and sympathy for her situation, and stated that he had changed all the supervision at Mounted Patrol and expected that to remedy the problem. Captain Brown personally attended several Mounted Patrol roll calls, demanded professionalism in response to the investigation, and stated that inappropriate behaviorSSincluding acts of retaliationSSwould not be tolerated.

The retaliation continued, however, and in February 1994, Sharp requested a transfer to an available position in a less prestigious duty station, the Police Academy; her request was granted.

## II.

Sharp sued the city, Hankins, and Bice, alleging, *inter alia*, sexual harassment and retaliation under title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and retaliation for exercise of her First Amendment rights under 42 U.S.C. § 1983. The

---

[2] Mary Alice Jones, Mounted Patrol's administrative assistant, testified regarding the retaliation, open discussions of plans to lie, and Chapman's role in failing to correct the retaliation and in blaming Sharp for the problems. Jones was offered a transfer from Mounted Patrol to remove her from harassment she had suffered; Sharp and Jones cite the transfer as part of HPD's ongoing enforcement of the code of silence, driving Jones from the elite division.

court granted the city's motion for summary judgment on the *title VII* retaliation claim.  The parties consented to trial before a magistrate judge (whom we refer to as the "court" or the "district court"), and Sharp prevailed on all remaining claims against all defendants.

The jury awarded compensatory damages against the city of $10,000 for harassment and $100,000 for retaliation.  Against Bice and Hankins each, the jury awarded $10,000 punitive and $5,000 compensatory damages.[3]  At the close of all the evidence, the city moved for judgment as a matter of law ("j.m.l."), and it now challenges the denial of that motion and the final judgment.

### III.

The evidence easily suffices to support the verdict that Sharp was sexually harassed and can recover under title VII therefor.[4] The substantial issues are whether the *city* may be held liable for Hankins's and Bice's harassment and whether Sharp can recover for retaliation under § 1983.

### A.

We review a denial of j.m.l. *de novo*.  *See Texas Farm Bureau*

---

[3] The judgments against Bice and Hankins are not at issue in this appeal.

[4] *See Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57 (1986); *Harris v. Forklift Sys., Inc.*, 510 U.S. 17 (1993).

*v. United States*, 53 F.3d 120, 123 (5th Cir. 1995). We view all evidence and reasonable inferences in favor of the non-movant; if reasonable persons could differ in their interpretation of the evidence, j.m.l. should be denied. Only if the facts and reasonable inferences are such that reasonable jurors could not reach a contrary verdict may the court properly enter a j.m.l. *See id.*

## B.

There are two paths by which Sharp may seek to impute liability to the city for Hankins's and Bice's harassment. The most obvious one is vicarious liability for acts, the commission of which were "aided . . . by the existence of the agency relation." *See Faragher v. City of Boca Raton*, 524 U.S. \_\_\_, \_\_\_, \_\_\_-\_\_\_, 118 S. Ct. 2275, 2290, 2292-93 (1998) (*quoting* RESTATEMENT (SECOND) OF AGENCY § 219(2)(d) (1957)); *see also Burlington Indus. v. Ellerth*, 524 U.S. \_\_\_, \_\_\_, 118 S. Ct. 2257, 2270 (1998).

This case was tried prior to the articulation of the new standard in *Faragher* and *Burlington*, so the court made no factual findings on vicarious liability. The jury was presented with only a negligence theory; because we affirm on that theory, we need not comment extensively on the Supreme Court's most recent pronouncements.

Sharp argues that the city is liable for its negligent failure to discover and remedy the harassment. The jury found liability in negligence, so our task is to determine whether that verdict is supported by the evidence and as a matter of law.

An employer may be liable for sexual harassment if it "knew or should have known of the harassment in question and failed to take prompt remedial action." *Williamson v. City of Houston*, 148 F.3d 462, 464 (5th Cir. 1998). This standard was not disturbed by *Faragher* or *Burlington*. "[A]n employer can be liable . . . where its own negligence is a cause of the harassment. An employer is negligent with respect to sexual harassment if it knew or should have known about the conduct but failed to stop it." *Burlington*, 524 U.S. at ___, 118 S. Ct. at 2267. Generally, the negligence standard governs employer liability for *co-worker* harassment. *See Williamson*, 148 F.3d at 464.[5] The concept of negligence thus imposes a "minimum standard" for employer liabilitySSdirect liabilitySSunder title VII, *see Burlington*, 524 U.S. at ___, 118 S. Ct. at 2267, a standard that is supplemented by the agency-based standards for vicarious liability as articulated in *Faragher* and *Burlington*.

The city does not dispute that the jury was properly

---

[5] *See also Faragher*, 524 U.S. at ___, 118 S. Ct. at 2289 (noting that the circuits uniformly have applied a negligence standard to title VII cases involving harassment by co-workers).

instructed on negligence.  Our task, then, is to determine whether a reasonable jury could have found that the city knew or, through the exercise of reasonable care, should have known of the harassment but failed to take appropriate remedial action.

1.

It is undisputed that before Sharp spoke to the IAD investigator, the only persons who knew about the harassment were Hankins, Bice, Sharp, Sergeant Brown, and the officers in Mounted Patrol who witnessed the incidents.  The question is whether, as a legal matter, their actual knowledge may be imputed to the city.

A title VII employer has actual knowledge of harassment that is known to "higher management"[6] or to someone who has the power to take action to remedy the problem.  *See Nash*, 9 F.3d at 404.  The "management" and "remedial power" standards blur together, however, when we examine who may be considered "management," for to be considered a "manager," a person must have the ability to exert control over employees.

This includes someone with the power not only to hire and fire the offending employee but also to take disciplinary action, to provide significant input into employment decisions, to instruct the offending employee to cease the harassing behavior, or to

---

[6] *Waltman v. Int'l Paper* Co., 875 F.2d 468, 478 (5th Cir. 1989); *see also Nash v. Electrospace Sys., Inc.*, 9 F.3d 401, 404 (5th Cir. 1993) (discussing failure of plaintiff to complain to "company hierarchy").

10

implement other means of taking remedial action. *See Williamson*, 148 F.3d at 466 (holding that "employer" includes supervisor "with some authority to address the harassment problem" in organization with strong chain of command where supervisor could direct offender to cease and discipline if offender failed to comply)[7]; *Nash*, 9 F.3d at 404; *Waltman*, 875 F.2d at 478.[8] Thus, the key to whose knowledge may be imputed to the employer is remedial power: There is no actual knowledge until someone "with authority to address the problem" is notified. *Nash*, 9 F.3d at 404.

Under this standard, the city did not have actual notice. Neither Sergeant Brown nor Sharp's fellow officers had authority to discipline Bice or Hankins or to take any other remedial actions. Because no one with remedial power over Hankins or Bice knew of the harassment, as a matter of law HPD and the city had no actual knowledge of it.[9]

---

[7] In *Williamson,* the supervisor whose knowledge was deemed sufficient to impute actual knowledge to the employer was an HPD sergeant. *See Williamson*, 148 F.3d at 463.

[8] This standard comports with that of other circuits. *See, e.g., Sauers v. Salt Lake County*, 1 F.3d 1122, 1125 (10th Cir. 1993) (holding that "agent[]," part of title VII's definition of "employer," includes someone who "serves in a supervisory position and exercises significant control over . . . hiring, firing, or conditions of employment") (internal quotation and citation omitted); *Paroline v. Unisys Corp.*, 879 F.2d 100, 104 (4th Cir. 1989), *vacated in part*, 900 F.2d 27 (4th Cir. 1990) (noting that agent "need not have ultimate authority to hire or fire to qualify as an employer, as long as he or she has significant input into such personnel decisions"); *Nichols v. Frank*, 42 F.3d 503, 508 (9th Cir. 1994) (observing that the "proper analysis . . . is what management-level employees knew or should have known").

[9] Sharp points out that Hankins had remedial power over Bice and knew of his harassing behavior. She argues this should suffice to impute actual
(continued...)

11

2.

The city also may be liable if it had *constructive* knowledge, *i.e.*, if through the exercise of reasonable care it should have known what was going on but failed to address it.  Whether an employer may be charged with constructive knowledge is, within certain legal constraints, a question of fact.

If the harassment complained of is so open and pervasive that the employer should have known of it, had it but opened its corporate eyes, it is unreasonable not to have done so, and there is constructive notice.[10]  Further, the existence and effectiveness of an anti-harassment policy may be relevant in determining whether the employer should have known about the hostile environment,[11] but an employer is not necessarily insulated from liability just because there is a grievance procedure, even if the victim has failed to utilize it.  *See Meritor*, 477 U.S. at 72.

There is no doubt that Hankins and Bice openly and pervasively

_____

[9](...continued)
knowledge to the city, at least where Bice's wrongdoing is concerned.  The matter is complicated by the fact that Hankins, too, harassed Sharp.  Because we affirm on the ground of constructive knowledge, we reserve this issue for a later day.

[10] *See Williamson*, 148 F.3d at 465; *Waltman*, 875 F.2d at 478; *cf., e.g., Waltman*, 875 F.2d at 478 (5th Cir. 1989) (graffiti in several locations, announcements over public address system, multiple public instances of unwanted touching).  *But cf. Watts v. Kroger Co.*, 147 F.3d 460, 463-65 (5th Cir. 1998) (in which all public comments were sex-neutral, while private comments were sexual).

[11] *See Williamson*, 148 F.3d at 466-67 (examining anti-harassment policies in determining employer's negligence); *cf. Burlington*, 524 U.S. at __, 118 S. Ct. at 2270 (noting affirmative defense of an effective grievance procedure in vicarious liability cases based on general title VII goal of preventing, rather than just remedying, harassment); *Faragher*, 524 U.S. at __, 118 S. Ct. at 2292 (same).

12

harassed Sharp within the closed context of Mounted Patrol. That is, from the perspective of those fourteen or so officers assigned to Mounted Patrol, the harassment was open and pervasive. Of course, harassment by definition always will be open and pervasive as to some group, if only as to the harasser and victim. But that is not enough. To impute constructive knowledge to the employer, we must find constructive knowledge on the part of someone whose actual knowledge also would impute knowledge to the employer.

This means a corporate enterprise "knew or should have known" something only when the appropriate persons within that enterprise "knew or should have known." In the context of sexual harassment, such persons are those with remedial power over the harasser. Thus, given that no one in Mounted Patrol had authority over Hankins, it is not enough that Sharp's harassment was so open and pervasive that every member of Mounted Patrol knew or should have known what was happening. The question is whether someone at the level of Hankins's supervisorSSCaptain BrownSSor higher, or someone who otherwise held remedial power, had constructive knowledge of the harassment.[12]

This is unlike the circumstance in *Waltman*, in which management and employees could read the same graffiti, observe the same publicly displayed "girlie pictures," and listen to the same public address announcements. Here, we have discrete incidents of

---

[12] *Cf. Williamson*, 148 F.3d at 466 (holding that notice to supervisor is notice to city).

13

harassment that were physically and temporally isolated from those with power to remediate. For the harassment to have been apparent to Captain Brown or anyone else, that person would have had to be at Mounted Patrol at the moment when Bice or Hankins made a lewd joke or demeaning gesture. Consequently, the harassment was in fact as hidden from those with remedial power as if it had taken place in a private office.

We must be careful, however, not to conflate the concepts of constructive and actual notice. The city in fact was unaware of the harassment at Mounted Patrol, and the harassment in fact was hidden. But constructive knowledge inquires into what the city, in the exercise of reasonable care, *should have known*.

It would be absurd to allow an employer to insulate itself from liability simply by isolating its units from management. The city had established a strict paramilitary chain of command, placed Sharp in an insular unit, and gave apparently unchecked operational control to a single person. The city thereby had a duty to exert reasonable care to ensure that that person did not use those circumstances to engage in and conceal sexual harassment.

The jury considered evidence that the city had breached this duty. The jury could have concluded that Captain Brown exerted almost no supervisory authority over Hankins or Mounted Patrol and that such negligent failure to supervise violated even internal HPD procedures. The jury also could have decided that Hankins was well

14

known to be a "loose cannon" with a drinking problem and that he had made vulgar and harassing remarks to female officers in the past, but that HPD, despite having been put on notice that Hankins might be a problem, had made no effort to supervise or constrain his behavior.

Furthermore, the jury could have decided that HPD tolerated and even fostered an attitude of fierce loyalty and protectiveness within its ranks, to the point that officers refused to address or report each other's misconduct. The jury could have surmised that this HPD-wide "code of silence" prevented Sergeant Brown and Sharp's fellow officers from doing anything about the harassment they saw on a daily basis.

Most compellingly, however, the jury could have found that Sharp had no real way to escape the situation—no viable means of reporting or addressing the harassment she endured. Having given total and effectively unfettered control of Mounted Patrol to Hankins, and having established a strict chain of command whereby an officer could be disciplined for bypassing an immediate superior, the city needed to provide an effective way around that hierarchy, so that someone subject to harassment by a supervisor could report the harassment and allow the city to remedy it.

To establish that it satisfied that duty, the city points in part to HPD's sexual harassment policy. At trial, Sharp admitted she was aware of the policy: Every police officer receives a copy and is required to read it. In relevant part, the policy states:

15

> Ideally, any employee who believes that he or she has been the object of sexual harassment should ask the offender to stop using the offensive behavior. If such action does not cause the behavior to stop, then the employee should report the alleged act immediately to his/her supervisor. . . . If the employee is not satisfied with the action taken by the supervisor or feels that the complaint would not be received objectively by that supervisor, the employee should bring the complaint to the attention of the [city-wide] Director of Affirmative Action. The Complaint will be investigated and the employee will be advised of the findings and conclusion. All actions taken to resolve complaints of sexual harassment through internal investigation shall be confidentially conducted.

Sharp admitted that, although she felt it would be useless to complain to her supervisor about his own misbehavior, she also did not complain to the affirmative action office. On the other hand, she presented abundant evidence that to lodge such a complaint against a fellow officer was effectively forbidden by the code of silence: Anyone who dared use this reporting procedure would suffer such a pattern of social ostracism and professional disapprobation that he or she likely would sacrifice a career in HPD. In essence, Sharp demonstrated that, owing to HPD's structure and customs, she faced an unfortunate dilemma: report the harassment and lose her career, or endure the harassment and lose her dignity.

Furthermore, Sharp presented evidence that the city's much-relied-on affirmative action bypass was ineffective. For example, when she went to the affirmative action office to complain that IAD was not putting enough effort into her case, the person with whom she spoke at first had no idea why she was there, then made no

16

effort to help her or in any way to work on her case.  Based on this evidence, and on the unusual circumstances in which Sharp found herself, the jury could have decided that the city had placed her into a harassing situation with no way out.  Thus, we uphold the verdict that the city, through the exercise of reasonable care, should have known about the harassment but failed to remedy it.

## IV.

The city appeals Sharp's recovery for retaliation in violation of her First Amendment rights under § 1983.  Although title VII also affords a remedy for retaliation against those who seek to enforce its provisions, *see* 42 U.S.C. § 2000e-3(a), the district court entered summary judgment on Sharp's title VII retaliation claim, and she proceeded to trial under § 1983, alleging retaliation for exercising her First Amendment right to free speech.  To prevail on her retaliation claim, Sharp must establish that (1) she engaged in a protected activity, (2) she suffered an adverse employment action, (3) there was a causal connection between the two, and (4) the execution of a policy, custom, or practice of the city caused the adverse action.[13]

The city contends that the court erred in failing to grant its motion for j.m.l. because Sharp failed to prove that she was

---

[13] *See Brady v. Fort Bend County*, 145 F.3d 691, 698 (5th Cir. 1998), *petition for cert. filed*, 67 U.S.L.W. 3364 (Nov. 16, 1998) (No. 98-820); *Harrington v. Harris*, 118 F.3d 359, 365 (5th Cir.), *cert. denied*, 118 S. Ct. 603 (1997).

17

subjected to an adverse employment action taken pursuant to a policy, custom, or practice.[14]  Sharp responds that the city waived the first argument and that her transfer and the written reprimand, on top of the other petty actions her co-workers and supervisors took against her, constitute adverse employment action.  She also argues that the evidence shows that the code of silence was a city policy, custom, or practice that led to the retaliation.

## A.

Relying on *Harrington*, 118 F.3d at 365, the city argues, for the first time on appeal, that Sharp failed, as a matter of law, to prove she suffered an adverse employment action.[15]  *Harrington* elucidates adverse employment action as "discharges, demotions, refusals to hire, refusals to promote, and reprimands."  *Id.* (citing *Pierce v. Texas Dep't of Criminal Justice*, 37 F.3d 1146, 1149 (5th Cir. 1994)).  The city failed to make a motion for j.m.l. on this basis.

When a party has not moved for j.m.l., we review its challenge to evidentiary sufficiency only for plain error.  *See McCann v. Texas City Refinery, Inc.*, 984 F.2d 667, 673 (5th Cir. 1993).  "In other words, this court will reverse only if the judgment

---

[14] The city does not challenge the other two elements.

[15] In its motion for j.m.l., the city never argued that Sharp, as a matter of law, had failed to prove an adverse employment action.  It merely contended that Sharp had failed to prove a policy, custom, or practice of the city.

18

complained of results in a manifest miscarriage of justice."
*United States ex rel. Wallace v. Flintco Inc.*, 143 F.3d 955, 963-64
(5th Cir. 1998) (quoting *McCann*, 984 F.2d at 673) (internal
quotation marks omitted).

Under plain-error review, the inquiry is whether the plaintiff
has presented any evidence in support of his claim.[16] So, if Sharp
presented any evidence supporting the finding of an adverse
employment action, we will decline to upset the verdict. *See
Polanco*, 78 F.3d at 974.[17] The record reflects that Sharp did
present such evidence.

Although the Supreme Court has intimated that the First

---

[16] *See Polanco v. City of Austin*, 78 F.3d 968, 974 (5th Cir. 1996); *McCann*,
984 F.2d at 673 ("[T]he question before this court is not whether there was
substantial evidence to support the jury verdict, but whether there was *any*
evidence to support the jury verdict.").

[17] Perhaps in an attempt to avoid plain-error review, the city intimates
that *Harrington* clarified the law on this issue after the trial had concluded,
and hence was not available for consideration by the district court. We
disagree.

The city relies on *Harrington*, which was issued on July 21, 1997, and
superseded a previously issued March 14, 1997, opinion, *see Harrington v. Harris*,
108 F.3d 598 (5th Cir. 1997). The two *Harrington* opinions, however, are
identical as to the portions of the superseding opinion cited by the city.
*Compare Harrington*, 118 F.3d at 365, *with Harrington*, 108 F.3d at 603-04. The
trial began on March 17, 1997, and concluded on March 27. The city had the
benefit of the first *Harrington* opinion before the trial and for nearly three
months before filing its post-trial motion for j.m.l.

Additionally, *Harrington* relies on less recent § 1983 cases for its
definition of "adverse employment action." *See* 118 F.3d at 365 (citing *Pierce*,
37 F.3d at 1149, and *Doresett v. Board of Trustees for State Colleges & Univs.*,
940 F.2d 121, 123 (5th Cir. 1991)). The law was not clarified or changed post-
trial and, therefore, there is no arguable basis for applying a standard of
review other than plain error.

19

Amendment protects against trivial acts of retaliation,[18] this court has required something more than the trivial, *see Pierce*, 37 F.3d at 1146.  The jury instruction, which the city does not challenge, reflected this standard.[19]  We need examine only whether there is any evidence that it was met.

Employer actions that can result in liability include more than just actual or constructive discharge from employment.[20] Adverse employment actions can include discharges, demotions, refusals to hire, refusals to promote, and reprimands.[21]

---

[18] *See Rutan v. Republican Party*, 497 U.S. 62, 76 n.8 (1990).  While *Rutan* did not involve a retaliation claim, we have applied it to such claims.  *See, e.g., Pierce*, 37 F.3d at 1149; *Click v. Copeland*, 970 F.2d 106, 110-11 (5th Cir. 1992).

[19] The jury was instructed that

an adverse employment action does not require a monetary loss, such as a formal demotion or termination.  Retaliation claims, however, require more than a trivial act to establish constitutional harm. To be actionable under Section 1983, a series of lesser actions, though trivial in detail when viewed in isolation, must, in total, be substantial and significantly penalize an employee for the exercise of the employee's First Amendment right to freedom of speech.

[20] *See Rutan*, 497 U.S. at 74; *Bickel v. Burkhart*, 632 F.2d 1251, 1255 n.6 (5th Cir. Unit A 1980).

[21] *See Benningfield v. City of Houston*, 157 F.3d 369, 375 (5th Cir. 1998); *Harrington*, 118 F.3d at 365; *Southard v. Texas Bd. of Criminal Justice*, 114 F.3d 539, 555 (5th Cir. 1997); *Pierce*, 37 F.3d at 1149.  We have not held this list to be exclusive and do not do so now, nor do we now expand it.

The city urges that *Mattern v. Eastman Kodak Co.*, 104 F.3d 702, 708 (5th Cir.), *cert. denied*, 118 S. Ct. 336 (1997), a title VII case, precludes a finding of "adverse employment action" by limiting that phrase to "ultimate employment decisions," which would exclude, for example, reprimands.  The definition of "adverse employment action," however, may be different under title VII from its definition under § 1983.  *See Messer v. Meno*, 130 F.3d 130, 140 (5th Cir. 1997) (stating that under title VII, ultimate employment decisions include hiring, discharging, promoting, compensating, or granting leaves, but not reprimands);

(continued...)

20

It is now well established that, for the purposes of a § 1983 retaliation claim, an adverse employment action can include a transfer, because it may serve as a demotion.[22]  In *Benningfield*, for example, we noted that "[a] transfer may also constitute a demotion."  *Benningfield*, 157 F.3d at 377 (citing *Forsyth*, 91 F.3d at 774; *Click*, 970 F.2d at 110).  To be equivalent to a demotion, a transfer need not result in a decrease in pay, title, or grade; it can be a demotion if the new position proves objectively worseSSsuch as being less prestigious or less interesting or providing less room for advancement.  *See Forsyth*, 91 F.3d at 774; *Click*, 970 F.2d 109.  The jury could have viewed transferring from the elite Mounted Patrol to a teaching post at the Police Academy to be, objectively, a demotion.

The city argues that because Sharp *requested* the transfer, it cannot be deemed "adverse," hence negating any finding of an

---

[21](...continued)
*Mattern*, 104 F.3d at 707-08 (excluding disciplinary filings and reprimands from ultimate employment decisions).  But this case does not implicate the potential differences between title VII's and § 1983's definitions of "adverse employment action," because under both statutes demotions can be adverse employment actions.  Although *Messer*'s and *Mattern*'s list of title VII adverse employment actions explicitly refers only to "hiring, granting leave, discharging, promoting, and compensating," *Mattern*, 104 F.3d at 707, a demotion, as well as a promotion, must meet the criteria.  *Cf*. *Burlington*, 524 U.S. at ___, 118 S. Ct. at 2268 ("A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.").  Accordingly, a demotion is an "adverse employment action" under both title VII and § 1983.

[22] *See Forsyth v. City of Dallas*, 91 F.3d 769, 774 (5th Cir. 1996); *Click v. Copeland*, 970 F.2d 106, 109 (5th Cir. 1992); *Fyfe v. Curlee*, 902 F.2d 401, 404-05 (5th Cir. 1990); *Reeves v. Claiborne County Bd. of Educ.*, 828 F.2d 1096, 1099 (5th Cir. 1987).

21

adverse employment action based on the transfer. Relying on *Nash*, 9 F.3d at 404, the city lays out this argument in skeletal form: Sharp's transfer cannot be retaliatory because it was voluntary. The employer in *Nash* escaped liability for transferring the employee out of the hostile environment so, *a fortiori*, the city should escape liability for granting a requested transfer. *Nash*, however, is inapposite for two reasons.

First, the *Nash* plaintiff admitted that the transfer was not an adverse employment action, *see id*. at 403, so the question was not before the court. Second, the facts of this case paint a much different picture from those in *Nash*. The facts there in no way supported a finding that the transfer amounted to demotion. Indeed, because the employer immediately initiated the transfer after receiving a sexual harassment complaint, the transfer represented a "prudent response to an unpleasant situation." *Id*. at 404. Here, on the other hand, the jury reasonably could equate the transfer with a demotion, and the city did not initiate the transfer to protect Sharp but rather waited until she felt compelled to request a transfer.

Other cases suggest that a "voluntary" transfer can contribute to finding an adverse action in a § 1983 retaliation suit. In *Williamson*, one of the issues was whether the employer had retaliated under title VII's retaliation provision. Although the opinion only cryptically addresses the issue, saying the evidence

22

was sufficient to support the verdict, *see Williamson*, 148 F.3d at 468, the facts included a requested transfer. In *Reeves*, the court found that "voluntarily accept[ing]" a transfer did not prevent a back pay damages award merely because it was related to the plaintiff's duty to mitigate. *Reeves*, 828 F.2d at 1099-1101.

Under the highly deferential plain error standard of review, we conclude that the jury was entitled to find that the transfer was not, in fact, voluntary[23]SSthat the retaliatory acts of the members of Mounted Patrol, including misdeeds such as tampering with Sharp's tack and failing to come quickly to her aid after her car accident, caused her reasonably to fear for her safety if she stayed in Mounted Patrol. The jury could have found that the transfer, albeit at Sharp's request, was a constructive demotion, the involuntary result of conditions so intolerable that a reasonable person would feel compelled to leave, and that the transfer constituted a non-trivial adverse employment action.[24]

Furthermore, Sharp presented evidence that the retaliatory acts that created the intolerable situation requiring her to transfer were not merely those of her co-workers. Her immediate

---

[23] "Voluntary" is defined as "[a]rising from one's own free will," . . . [a]cting on one's own initiative," . . . [a]cting or done with no external persuasion or compulsion . . . ." WEBSTER'S II NEW RIVERSIDE UNIVERSITY DICTIONARY 1294 (Riverside 1984). Under these definitions, a reasonable jury certainly could have concluded that Sharp's transfer was not voluntary but, instead, was more like a "voluntary" resignation in a constructive discharge situation.

[24] *Cf*. *Faruki v. Parsons S.I.P., Inc.*, 123 F.3d 315, 319 (5th Cir. 1997) (concluding that a resignation is a constructive discharge if a reasonable employee would feel compelled to resign); *Jurgens v. EEOC*, 903 F.2d 386, 390-91 (5th Cir. 1990).

23

supervisors, as well as their supervisors including Nuchia, were aware of the retaliation and failed to stop the retaliatory acts.

Sharp's expert witness testified that, following the investigation, HPD completely failed to comply with department standards in terms of the retaliation against her and the disciplining of officers. She also presented testimony by Mounted Patrol's administrative assistant that Chapman, the new supervisor at Mounted Patrol, had treated her poorly and openly blamed her for the problems at Mounted Patrol. These facts support an inference that Sharp's supervisors encouraged the retaliatory acts and that Chapman, at least, had participated in them to a limited extent, driving Sharp to request the transfer. All of this constitutes some evidence supporting Sharp's position, which is all the plain error standard requires.[25]

## B.

In its motion for j.m.l, the city argued that Sharp had failed to demonstrate a policy, custom, or practice of the city, the execution of which caused the adverse employment action. Because the city preserved this argument, we review the denial of its motion for j.m.l. *de novo*. Sharp relies on retaliations for violations of the "code of silence" as the city's custom and

---

[25] We emphasize that our decision results from the highly deferential plain-error standard of review; under any lesser standard, we might very well be reticent to agree that Sharp suffered an adverse employment action.

24

practice. She presented ample evidence that a code of silence exists. No fewer than nine witnesses testified that it does, and, as one expert witness pointed out, Nuchia admitted to the code's existence. Furthermore, the code can be perpetuated only if there is retaliation for violations of it. The jury instructions, to which the city did not object, included retaliation as part of what defines a code of silence.

The city argues that it does not condone the code of silence and has taken actions to discourage it. Based on the evidence presented at trial, however, the jury could have decided that the HPD tolerated and even fostered an attitude of fierce loyalty and protectiveness within its ranks, to the point that officers refused to address or report each others' misconduct. A jury further could conclude that the city's steps to eliminate the code were merely cosmetic or came too slowly and too late to rebut tacit encouragement.

The jury could have surmised that Sharp's co-workers and supervisors enforced this HPD-wide "code of silence" by retaliatory acts. As we have noted, any officer who violated the code would suffer such a pattern of social ostracism and professional disapprobation that he or she likely would sacrifice a career in HPD. In Sharp's case, the jury could determine, based on the tampering with her tack and the delayed response to her traffic accident, that the retaliation went beyond just social ostracism and professional disapprobation actually to threaten her physical

25

safety.

Furthermore, the failure of Sharp's supervisors all the way up the chain of command, including Nuchia, to take any real action when made aware of the retaliation supports a conclusion by the jury that the HPD had a policy, custom, or practice of enforcing the code of silence. The evidence also supports a finding that HPD, although aware of the actions being taken against Sharp, exhibited deliberate indifference to her constitutional rights by its inaction. Such deliberate indifference can serve as the basis of municipal liability under § 1983. *See Canton v. Harris*, 489 U.S. 378, 388 (1989).

To rebut the claim of a policy, custom, or practice, the city relies primarily on discrete instances when it did take appropriate action in response to complaints, such as the IAD investigations of Bice and Hankins. But a custom or practice of deliberate indifference to rights need not be followed at every juncture in order to constitute "tacit authorization or encouragement of wrongful conduct." A reasonable jury could conclude that the HPD acted in the exceptional and highly visible cases, yet deliberately chose not to respond to numerous instances of retaliation.

In addition, the city makes no argument to refute certain testimony on which the jury could have based its verdict. Chapman admitted that he took no action to stop the daily acts of retaliation within Mounted Patrol. Nuchia warned Sharp that she

26

would be subjected to retaliation and told her it was her "destiny." He also told her that he knew certain officers had lied in the recent IAD investigation, but that he was not going to take action against them. As two witnesses testified, several officers were so confident that they would not be punished for lying in the investigation that they made no secret of their intention to do so.

From other testimony, the city draws inferences and conclusions in its favor; but we must do the opposite. The jury could have believed that the city's proffered reasons for Sergeant Brown's transfer were pretextual and that the city transferred him in retaliation for violating the code of silence. The jury also could accept that the "voluntary" transfer from Mounted Patrol offered Jones was no more voluntary than was Sharp's.

The city emphasizes that two-thirds of IAD complaints originate from within HPD, without triggering vast retaliation; yet the city ignores testimony that it is "uncommon" if not unheard of for these complaints to be filed by a subordinate against his superior officer. The city points out that several witnesses admitted they had not been retaliated against for coming forward, but for at least two of these witnesses the testimony may have been a complete surprise to colleagues within Mounted Patrol, affording no opportunity for retaliation *ex ante*. When we draw reasonable inferences in favor of Sharp, the non-movant, evidence supports the conclusion that HPD at least tacitly authorized, and maybe

27

encouraged and assisted in, retaliation against subordinate officers who broke the code of silence.

We cannot conclude that the jury acted unreasonably in reaching its decision. Because reasonable jurors could find that a city policy, custom, or practice caused Sharp to suffer an adverse employment action, we affirm the judgment based on the verdict on Sharp's First Amendment § 1983 retaliation claim.

V.

In summary, we find no reason to upset the verdict. Sharp presented sufficient evidence, under the appropriate standards of review, for a jury to conclude that the city had constructive notice of the sexual harassment and that she suffered an adverse employment action that resulted from a policy, custom, or practice of retaliation. The judgment is AFFIRMED.

28