**UNITED STATES COURT OF APPEALS
FIFTH CIRCUIT**

_____

No. 02-30090

_____

DOROTHY BANKS; ET AL,

Plaintiffs,

TINA BROOKS; SHIRLEY BROWN; ANNETTE J GRAY; MARY
HOLMES; ANNIE JOHNSON; AMY LANE; ROSA MALVEAU;
DOROTHY MCPIPE; ALMA NEWMAN; MAGGIE TUCKER;
BERTHA TWINE; BERTHELLA WALLACE; EDNA WELCH;
MARY WILLIAMS; NELLIE WILLIAMS,

Plaintiffs - Appellants,

versus

EAST BATON ROUGE PARISH SCHOOL BOARD; INGRID
KELLEY; WARREN L PRATT, JR; PRESS L ROBINSON, SR,
DR; JACQUELINE MIMS; PATRICIA HAYNE-SMITH; NOEL
HAMMATT; ROGER MOSER; DANIEL R HENDERSON;
ELDON R LEDOUX; DALTON DEVALL; WILLIAM P BLACK;
JAMES MANLEY,

Defendants - Appellees.

_____

Appeal from United States District Court for the
Middle District of Louisiana

_____

February 19, 2003

Before EMILIO M. GARZA and CLEMENT, Circuit Judges, and DAVIS[*], District Judge.

_____

[*] District Judge of the Eastern District of Texas, sitting by designation.

EMILIO M. GARZA, Circuit Judge:

Fifteen female plaintiffs (collectively, "Employees") formerly or currently employed as janitors by the East Baton Rouge Parish School Board appeal the district court's decisions granting summary judgment in favor of the Board, its individuals members, and James Manley, the Personnel Supervisor for the Board's Maintenance Department (collectively, the "Board"). In granting summary judgment, the district court dismissed Employees' Title VII retaliation and disparate impact discrimination claims, as well as their § 1983 retaliation claim, against the Board. Employees argue that the district court erred in concluding that Employees failed to make a prima facie showing of an adverse employment action under either Title VII or § 1983. According to Employees, the Board's implementation of a reading requirement and new salary structure for a new Janitor position, which was created pursuant to a consent decree entered into with the U.S. Department of Justice (the "DOJ"), thwarted Employees' immediate "promotion." This action, according to Employees, kept them from reaching their appropriate pay level and step and was, therefore, an adverse employment action under both Title VII and § 1983. Employees also argue that the district court erred in concluding that Employees failed to make a prima facie showing under Title VII that the reading requirement, implemented by the Board, selected applicants for the new Janitor position in a discriminatory pattern resulting in a sex-based imbalance in the Board's workforce.

I

We begin with a brief summary of the unique facts of this case. The Board employed janitors in three capacities: "Janitor I," "Janitor II," and "Janitor III." Janitor I employees, all of whom were female, worked part-time for six hours a day, nine months of the year. They were responsible for performing the most basic janitorial tasks. The Janitor II employees, most of whom were male,

worked eight hours a day for the entire year. They were responsible for performing tasks essentially the same as those performed by Janitor I employees, with the addition of some duties, such as lawn care. Janitor III employees, all of whom were male, worked full-time and were responsible for performing tasks essentially the same as those performed by Janitor I and Janitor II employees, with the addition of some supervisory tasks, such as locking up buildings and supervising cleaning crews.

The Employees, all of whom are female, were Janitor I employees. After the Board decided to eliminate the medical benefits received by Janitor I employees and to reduce their working hours (from six hours per day to four hours per day), a number of Janitor I employees, including Employees, sued the Board in state court, alleging that the Board's action had a disparate impact on female employees in violation of Louisiana state law, since all Janitor I employees were female. Their suit also alleged intentional sex discrimination in violation of Louisiana state law.

While the state court lawsuit was still pending,[1] the DOJ began an inquiry into the Board's procedures for placing women into the Janitor II and Janitor III positions. The impetus for the DOJ investigation was the allegation that the Board discriminated against women on the basis of their gender in violation of Title VII by reserving the Janitor II and Janitor III positions for males only.

Subsequently, the Board began to evaluate all school system positions, including job descriptions and salary schedules, for the stated purpose of eliminating the inefficient use of resources. All janitor and custodian classifications were included in this study. The Board decided to phase out the three-tiered janitor position and replace it with two new positions: "Janitor" and "Lead Janitor." The Janitor position (the "new Janitor position") combined the duties of the Janitor

---

[1] The state court ultimately dismissed the plaintiffs' lawsuit with prejudice. The plaintiffs chose not to appeal the state court judgment.

I and Janitor II positions. The "Lead Janitor" position was intended to be the equivalent of the Janitor III position. Both the new Janitor position and the Lead Janitor position were full-time positions, with medical benefits. However, the Board created a new pay scale, which resulted in lower hourly pay for any Janitor I employee who accepted the new Janitor position. Additionally, the Board implemented a testing procedure to select applicants for the new Janitor position. Applicants were required to take and pass a "practical" test involving the use of maintenance equipment, as well as a reading test, which tested an applicant's ability to read at an eighth-grade level. Applicants for the Lead Janitor position were not required to take either of these two tests.

The Board's implementation of the reading test for the new Janitor position was, according to the Board, its response to an incident in which at least one Board employee was sickened as a result of a custodian's failure to follow printed instructions on the use of a pesticide. The Board maintains that safety concerns demanded its new Janitors be able to read at an eighth-grade level, since the safety guidelines of the Occupational Safety and Health Administration were written on an eighth-grade level, as were most Material Safety Data Sheets, which are required for all chemicals used in the workplace.

The Board subsequently entered into a consent decree (the "Consent Decree") with the DOJ, which incorporated the Board's plan for the new Janitor position and Lead Janitor position, as well as its plan for a new salary structure. The purpose of the Consent Decree was to resolve all issues raised by the DOJ in a separate lawsuit that the DOJ, after its lengthy investigation of the Board, brought against the Board under Title VII, alleging discrimination against females in the hiring and promotion of janitors. *See United States v. East Baton Rouge Parish Sch. Bd.*, No. 97-264-A-3. The Consent Decree provided that "interested and qualified incumbent employees in the Janitor I

-4-

. . . positions [would] be provided . . . an opportunity to be promoted to the new Janitor position." It made no mention of the reading requirement, though it did state that "[a]pplicants selected for possible employment as Janitors or Lead Janitors may be required by the School Board to pass additional lawful and job-related selection devices or requirements."

Thereafter, when Employees (except those who chose not to do so) applied for the new Janitor position, they took the "practical" test and the reading test.[2] Though all passed the "practical" test, only one passed the reading test.[3] Unlike the day-by-day substitutes and applicants off the street who were later given an opportunity to apply for the new Janitor position, Janitor I employees who failed the reading test were given the option of either remaining in their old Janitor I jobs or taking the new Janitor position on a probationary basis, regardless of their current reading ability.[4] Attendance at adult reading classes was a condition of this probation. Those who accepted the probationary Janitor position would be paid at the lowest step in the new pay scheme until demonstrating an eighth-grade reading level on the retest, at which time the person would be moved up the salary schedule to a step corresponding to the step she had occupied on the old Janitor I salary

---

[2] Plaintiffs Dorothy Banks, Amy Lane, and Bertha Twine, who elected not to proceed with the application process for the new Janitor position, did not take the practical test or the reading test.

[3] Plaintiff Shirley Brown was the only one to pass both the practical test and the reading test. Brown was offered employment in the new Janitor position, which she accepted. She was placed on the step in the new salary schedule that corresponded to the step she had occupied in the Janitor I salary schedule.

[4] The day-by-day substitutes working for the Board were later offered an opportunity to apply for the new Janitor position. They, unlike the part-time Janitor I employees, were required to exhibit, at a minimum, a fifth grade reading level before being offered the job on a probationary basis. When the Board, after advertising the position to the public, began to fill vacancies in the Janitor position, it held those applicants to the eighth grade reading requirement; if they failed to exhibit an eight grade reading level, they were not offered the position.

schedule. According to Employees, some were informed that, if they failed the reading test a second time, they would lose their jobs; and all were informed that, if they decided to accept the new Janitor position on a probationary basis, they could not return to their old Janitor I positions. Employees also claim that they were informed that any Janitor I employee who failed the first reading test for the new Janitor position would not be allowed to remain in her current Janitor I position while preparing to retake the test. Also, according to Employees, when Plaintiff Rosa Malveau asked James Manley why the Janitor I employees had to take a reading test for the new Janitor position, Manley responded, "That's what you get for filing a lawsuit."

After filing a charge with the Equal Employment Opportunity Commission, in which Employees claimed that the Board discriminated against them on the basis of their gender and retaliated against them for participating in the state court lawsuit, Employees filed the instant suit against the Board in the federal district court. Their federal suit claimed unlawful retaliation and disparate impact employment discrimination under Title VII, as well as unlawful retaliation under 42 U.S.C. § 1983. Concluding that Employees failed to state a prima facie case of retaliation or disparate impact discrimination under Title VII, or of retaliation under § 1983, the district court granted the Board's motion for summary judgment and dismissed all of Employees' claims.

We review the district court's grant of summary judgment *de novo*. *Tolson v. Avondale Indus., Inc.*, 141 F.3d 604, 608 (5th Cir. 1998). Summary judgment is proper when there "is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Conoco, Inc. v. Medic Sys., Inc.*, 259 F.3d 369, 371 (5th Cir. 2001) (citation omitted). A court considering a motion for summary judgment must draw all reasonable inferences in favor of the non-moving party. *Duplantis v. Shell Offshore, Inc.*, 948 F.2d 187, 189 (5th Cir. 1991).

II

Employees contend that the Board implemented the new salary structure and reading requirement for the new Janitor position in retaliation for Employees' participation in a previous state lawsuit against the Board. According to Employees, the district court erred in concluding that Employees failed to make a prima facie case of retaliation under Title VII.[5]

To survive summary judgment in a Title VII retaliation case, the plaintiff must make a prima facie showing: "(1) that the plaintiff engaged in activity protected by Title VII, (2) that an adverse employment action occurred, and (3) that a causal link existed between the protected activity and the adverse action." *Raggs v. Miss. Power & Light Co.*, 278 F.3d 463, 471 (5th Cir. 2002). An employment action that "does not affect job duties, compensation, or benefits" is not an adverse employment action under Title VII. *Hunt v. Rapides Health Care Sys.*, LLC, 277 F.3d 757, 769 (5th Cir. 2001). Only "ultimate employment decisions such as hiring, granting leave, discharging, promoting, and compensating" satisfy the adverse employment action element. *Dollis v. Rubin*, 77 F.3d 777, 781-82 (5th Cir. 1995) (citation omitted). A demotion also qualifies as an adverse employment action under Title VII. *Sharp v. City of Houston*, 164 F.3d 923, 933 n.21 (5th Cir.

---

[5] Under Title VII,

> it is an unlawful practice for an employer to discriminate against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."

42 U.S.C. § 2000(e)-3(a). The meaning of "discriminate" in § 2000(e)-3(a) is informed by § 2000(e)-2(a)(1), which provides: "It should be an unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment." *Fierros v. Texas Dept. of Health*, 274 F.3d 187, 191 (5th Cir. 2001).

1999). Title VII does not, however, address "every decision made by employers that arguably might have some tangential effect upon those ultimate decisions." *Burger v. Cent. Apartment Mgmt.*, 168 F.3d 875, 878 (5th Cir. 1999). For example, a decision made by an employer that only limits an employee's opportunities for promotion or lateral transfer does not qualify as an adverse employment action under Title VII. *See Burger*, 168 F.3d at 878-80 (holding that an employer's refusal of an employee's request for a "purely lateral transfer" does not qualify as an adverse employment action under Title VII); *Dollis,* 77 F.3d at 782 (affirming the decision that an employer's denial of a "desk audit" to a female employee is not an adverse personnel action under Title VII, even though the employee claimed it was an ultimate employment decision that restricted her "promotional opportunities").

Here, the district court reasoned that Employees failed to demonstrate that the Board's implementation of the reading requirement and new salary structure for the new Janitor position was an ultimate employment decision, since the creation of the new Janitor Position was not an "ordinary promotion situation," and since Employees had the choice of staying in their current Janitor I positions with no adverse consequences. However, according to Employees, the Board's implementation of a reading requirement and a new salary structure for the new Janitor position thwarted Employees' immediate "promotion" to their appropriate pay level and step,[6] and was,

---

[6] Employees argue that the Board's new policy for "promoting" Janitor I employees into the new Janitor position was out of sync with its established policy for promoting employees, and therefore thwarted their "promotion" to the appropriate pay level and step in the new Janitor position. The established policy of the Board for promoting an employee was to assign that employee to a pay grade called for by the new position at a step equal to or above his or her previous salary, plus 5 %. In contrast, a Janitor I employee who accepted the new Janitor position was placed either at step zero (if she did not pass the reading test) or in the same step of the new scale (if she passed the test), which was a lower hourly rate. Thus, Employees complain that, even though the Consent Decree characterized the move from the Janitor I position to the new Janitor position as an opportunity to

therefore, an ultimate employment decision. The Board's placement of "onerous" conditions on the new Janitor position, Employees contend, denied Employees the greater hours, greater compensation, and medical benefits which they sought.

Regardless of whether the conditions placed on the new Janitor position were unfavorable to Employees seeking to be "promoted" to it, the Board's implementation of this new position, with its new salary structure and reading requirement, did not amount to an ultimate employment decision under Title VII. As the district court correctly reasoned, the move from Janitor I to the new Janitor position was not a part of "any internal ordered scheme of promotion to which the plaintiffs were entitled, either from years of service or job performance." Pursuant to the Consent Decree, which provided that "interested and qualified incumbent employees in the Janitor I . . . positions [would] be provided . . . an opportunity to be promoted to the new Janitor position," the Board gave Employees a right of first refusal for the new Janitor position.[7] Yet, Employees have not provided any authority showing that an employer's act of giving an employee a right of first refusal for a new

be "promoted," those Janitor I employees would have to accept a lower pay rate in order to move into the new position, regardless of their experience. For example, Plaintiff Rosa Malveau, who was at step 15 of the Janitor I pay scale (G-12), $10.90 per hour, argues that the Board should have offered to place her in step 19 of the new Janitor scale (G-14), $11.03 per hour, instead of step zero, $5.82 per hour.

[7] Following the district court's approval of the Consent Decree, all Janitor I employees, including Employees, were contacted either by James Manley, or his secretary, regarding the new Janitor position. Janitor I employees were given the option of either going forward with the application process or remaining in their Janitor I positions. Those Janitor I employees interested in applying were directed to report to the Maintenance office complex to participate in testing designed to evaluate whether they possessed the qualifications required for the new Janitor position. Persons employed as Janitor I employees (including Employees herein, except those who chose not to participate) were the only ones tested at the first testing sessions for the new Janitor position. After completing the testing process, those who participated were contacted by Manley to discuss their test results and options, including the option of taking the new Janitor position on a probationary basis.

job can constitute an ultimate employment decision under Title VII. Neither have Employees demonstrated that, by giving Employees a right of first refusal for the new Janitor position, the Board in any way coerced Employees into accepting that position and its lower hourly wages.[8] On the contrary, the summary judgment evidence established that, consistent with the Consent Decree, Janitor I employees who either did not apply for the new Janitor position or did not accept the position on a probationary basis were allowed to stay in their Janitor I positions at their current wage rate and seniority status, free from adverse consequences.[9] Thus, the Board's implementation of the new Janitor position, for which Employees had a right of first refusal, did not constitute an ultimate employment decision because it did not affect Employees' job duties, compensation, or level of benefits as Janitor I employees. *See Hunt*, 277 F.3d at 769.

As for the reading requirement, Employees argue that its implementation was an ultimate employment decision by the Board because it "was represented to [Employees] as the requirement for an immediate promotion to a full-time position which they sought," and because it was a "stumbling block" to their "immediate promotion" to the full-time position, for which, Employees claim, they were qualified.[10] We do not agree that the Board's implementation of the reading

---

[8] Employees state that "[a]lmost all plaintiffs-appellants, like Ms. Malveau, rejected the new Janitor job because it meant too many more work hours for too little pay with too many risks. Only Maggie Tucker . . . accepted the new Janitor position, regardless of the cut in hourly pay."

[9] The Consent Decree directs that "an incumbent employee who declines the newly established Janitor or Lead Janitor position shall retain his or her current wage rate, seniority status, and other attendant benefits, if any."

[10] Employees offered summary judgment evidence suggesting that the reading test was not an appropriate measure of the janitorial skills necessary to perform the work required of those in the new Janitor position, and that they were qualified for the new position because its duties were essentially the same as their duties as Janitor I employees.

requirement constituted an ultimate employment decision. Although the reading test prevented all but one of the Employees from making an immediate change to the new Janitor position, any of the Employees who failed the reading test still had the option of exercising her right of first refusal and occupying the new Janitor position on a probationary basis until the retest. Because Employees do not allege that the reading test was unfairly rigged to prevent them from passing, we may assume that the test was a fair assessment of reading skills. *See Mattern v. Eastman Kodak Co.*, 104 F.3d 702, 709 (5th Cir. 1997) (reasoning that, because the plaintiff who failed two "Major Skills Tests" did not maintain that the tests were unfairly rigged, the tests were, presumably, a "correct assessment" of her ability to perform those skills). Even assuming that the Board told Employees they would lose their jobs if they accepted the probationary position but failed the retest, the Board's decision to implement the reading requirement was, at most, a mediate decision that *could lead* to an adverse employment decision for an applicant who failed that retest. Thus, the Board's decision to implement the reading requirement for the new Janitor position does not qualify as an ultimate employment decision under Title VII. *See Dollis*, 77 F.3d at 780 ("Title VII's anti-retaliation provision [does not] refer[] to . . . 'interlocutory or mediate' decision[s] which can lead to an ultimate decision." (internal quotations omitted)).

For these reasons, we conclude that Employees failed to show that the Board's implementation of the reading requirement and new salary structure for the new Janitor constituted an adverse employment decision.[11] We therefore hold that the district court correctly decided that Employees failed to make a prima facie showing of Title VII retaliation.

---

[11] Since Employees failed to make a prima facie showing of an adverse employment decision, we need not consider whether Employees established a causal link between the protected activity and the alleged adverse employment decision.

III

Employees argue that the Board's actions had a disparate impact on female janitorial employees, since the only persons impacted by the reading test were Janitor I employees, all of whom were female. Thus, according to Employees, the district court erred in ruling that Employees failed to state a prima facie case of disparate impact employment discrimination under Title VII. The district court reasoned that Employees failed to show that the reading requirement resulted in a sex-based imbalance in the Board's workforce, regardless of any pre-existing imbalance in the workforce.

To establish a prima facie case of Title VII disparate impact employment discrimination, a plaintiff must show that the employer's facially neutral hiring standards select applicants in a significantly discriminatory pattern. *Dothard v. Rawlinson*, 433 U.S. 321, 329, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977) (citing *Griggs v. Duke Power Co.*, 401 U.S. 424, 432, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971)). Here, neither party disputes that the reading requirement was a facially neutral employment practice.[12] However, Employees contend that the Board's implementation of the reading requirement had a disparate impact on female employees. According to Employees, female Janitor I employees were the only incumbent employees adversely impacted by the reading requirement, since the mostly-male Janitor II employees could place into Lead Janitor positions without having to take a reading test. Employees contend that the Board "could not permissibly or lawfully create a new standard that impacted only female employees."

Initially, we must decide how to measure the alleged disparate impact. Employees propose that, as a group, incumbent employees who were required to take a reading test to place into any new

---

[12] Employees do not dispute that all persons, male and female, seeking full-time employment in the new Janitor position, whether a Janitor I, a day-by-day substitute, or off the street, were required to meet the reading requirement by demonstrating an ability to read at an eight grade level.

janitorial or custodial position should be compared with all incumbent employees who placed into any new janitorial or custodial positions. The Board, however, correctly argues that the we should compare the group of applicants who placed into the new Janitor position with the entire pool of applicants for that new position. *See Bunch v. Bullard*, 795 F.2d 384, 395 (5th Cir. 1986) ("The threshold inquiry . . . is whether the plaintiffs have shown that the tests in question select applicants for hire or promotion in a [sex] pattern significantly different from the pool of applicants."); *Page v. U.S. Indus., Inc.*, 726 F.2d 1038, 1053-54 (5th Cir. 1984) ("[W]e have held that a showing of 'marked disproportion' between the representation of the allegedly disfavored group in the employer's workforce and its representation in the labor pool from which employees are selected suffices to establish a prima facie case of disparate impact.").

Using persons who placed into the new Janitor position and the entire pool of applicants for that position as groups for comparison, we must decide whether Employees presented either statistical or non-statistical evidence establishing a prima facie case of disparate impact. *See Page v. U.S. Industries Inc.*, 726 F.2d 1038, 1053 (5th Cir. 1984) ("A plaintiff may use statistical as well as non-statistical evidence in establishing a prima facie case of disparate impact."). Although the female Janitor I employees were given a right of first refusal for the new Janitor position, the position was otherwise open to both male and female applicants. Employees have not produced any statistical evidence tending to show that the reading requirement operated in a way which selected applicants from the protected group – females – in a sex pattern "markedly disproportionate" from the entire pool of applicants for the new Janitor position, of which Employees were a part. *See Bunch*, 795 F.2d at 395 ("The tests must be 'significantly discriminatory' or at least create percentages which are 'markedly disproportionate.'") (quoting *Rivera v. City of Wichita Falls*, 665 F.2d 531, 534-35 (5th

Cir. 1982)).[13] Neither have Employees produced non-statistical evidence demonstrating that the reading requirement selected females in a sex pattern significantly different from the entire pool of applicants for the new Janitor position. Employees simply argue that "Plaintiffs, all female, were the only ones impacted by the added reading test." Thus, Employees have failed to raise a genuine issue as to whether the facially neutral reading tests selected applicants in a significantly discriminatory sex pattern. We therefore hold that the district court correctly concluded that Employees failed to establish a prima facie case of Title VII disparate impact discrimination.

IV

Employees also contend that the district court erred in reasoning that Employees failed to make a prima facie showing of an adverse employment action under § 1983. Employees argue that, because of their participation in a state lawsuit against the Board, an activity protected by the First Amendment, the Board retaliated against them through its "failure to promote and pay [Employees] at the appropriate rate" and its "use of [an] inappropriate test to block [Employees'] rightful positions."

To state a claim of retaliation for exercise of First Amendment rights under § 1983,

---

[13] Employees claim "[t]here is no need to resort to a statistical analysis." The Board, however, provided statistical evidence showing that the selection of the protected group, females, actually exceeded the selection of the non-protected group, males. The Board explains that, since this position was created and these reading tests have been used, a total of 548 females and 471 males have applied for employment in this position. Of those applicants, 87 females (or 15.9% of the total female applicants) and 56 males (or 11.9 % of the total male applicants) were selected for employment in the position. *Compare Bunch v. Bullard*, 795 F.2d 384, 395 (5th Cir. 1986) (determining that the observed disparity between the pass rate for blacks (23%), the protected group, compared with the pass rates for whites (80%), the non-protected group, for the IPMA promotional test was "great enough to permit the conclusion that a prima facie case of disparate impact [had] been established."). The Board also maintains that "the figures show that, in reality, more women have been selected for employment for the new janitor position than men despite the testing requirements."

Employees must show that 1) they engaged in a protected activity, 2) they suffered an adverse employment action, 3) there was a causal connection between the two, and 4) the execution of a policy, custom, or practice of the Board caused the adverse action. *Sharp v. City of Houston*, 164 F.3d 923, 932 (5th Cir. 1999). Section 1983's definition of adverse employment action, like Title VII's definition, includes ultimate employment decisions, such as hiring, granting leave, discharging, promoting, demoting, and compensating. *Id*. at 933 n.21.

Employees' § 1983 claim concerns the Board's alleged "failure to promote and pay at the appropriate rate" and "use of [an] inappropriate test to block [Employees'] rightful positions." Thus, Employees' § 1983 claim purportedly concerns promoting and compensating, activities which are characterized as ultimate employment actions under § 1983 and Title VII. *Id.* However, in light of the analysis supporting our determination that Employees have failed to make a prima facie showing that the Board's implementation of a new salary structure and reading requirement for the new Janitor position constituted an ultimate employment action under Title VII, *see infra* Part II, we conclude that Employees have failed to make a prima facie showing that the Board's alleged "failure to promote and pay [Employees] at the appropriate rate" and "use of [an] inappropriate test to block [Employees'] rightful positions" constitutes an ultimate employment action under § 1983.

We recognize that § 1983's definition of adverse employment action may be broader than Title VII's definition, which limits the meaning of adverse employment action to ultimate employment decisions. *Sharp v. City of Houston*, 164 F.3d at 933 n.21. (citing *Mattern v. Eastman Kodak Co.*, 104 F.3d 702, 708 (5th Cir. 1997), *cert denied*, 522 U.S. 932, 118 S.Ct. 336, 139 L.Ed.2d 260 (1997)). For example, the definition of adverse employment action under § 1983 may include reprimands and disciplinary filings, which do not qualify as ultimate employment decisions under Title

-15-

VII. *See id*. Also, for purposes of a § 1983 claim, a transfer that is "equivalent to a demotion" can be an adverse employment action. *Id*. at 933. However, we need not consider whether the Board's alleged "failure to promote and pay [Employees] at the appropriate rate" or its "use of [an] inappropriate test to block [Employees'] rightful positions" meets § 1983's broadened definition of adverse employment action, since Employees do not characterize such actions as a reprimand, disciplinary action, or transfer "equivalent to a demotion."[14]

For these reasons, we conclude that Employees failed to demonstrate an adverse employment action under § 1983. We therefore hold that the district court correctly decided that Employees failed to make a prima facie showing of retaliation under § 1983.

V

In sum, the district court did not err in deciding that the Board's implementation of the new Janitor position, with its reading requirement and new salary structure, did not qualify as an "adverse employment action" under Title VII, or under § 1983. Nor did the district court err in concluding that Employees failed to show that the Board's implementation of a reading requirement for the new Janitor position selected applicants in a significantly discriminatory sex pattern. Because Employees failed to state a prima facie case of retaliation or disparate impact employment discrimination under

---

[14] Even though Employees argue that they had to accept lower hourly pay in order to move from Janitor I position to the new Janitor position, and that this was contrary to the Board's established policy for promoting employees to a step equal to or above their previous salary, plus 5 %, Employees do not characterize the move from Janitor I to the new Janitor position as a transfer "equivalent to a demotion." Even if Employees had argued that the move qualifies as a transfer "equivalent to a demotion," it is unlikely that we would agree to characterize it as such, since Employees presented no evidence suggesting that they felt compelled to request a transfer to the new Janitor position. *See Sharp*, 164 F.3d at 934 (reasoning that the jury reasonably could equate the employee's requested transfer with a demotion because the employer waited until the employee felt "compelled to request a transfer").

Title VII, and because Employees failed to state a prima facie case of retaliation under § 1983, we affirm the district court's grant of summary judgment in favor of the Board.

AFFIRMED.