MARION F. EDWARDS, Chief Judge.
12Plaintiffs/appellants, Tim Tatum (“Tatum”) and Richard G. Hilliard (“Hilliard”), filed suit against defendants/appellees, United Parcel Service, Inc. (“UPS”); Roman Williams; Karl Gramm; and Jeanne Lawrence (“Lawrence”), alleging various claims of racial discrimination in the workplace. Tatum alleged acts of retaliation by the defendants, which were designed to compel his resignation and which resulted in his constructive discharge. He alleged *1096 an action for intentional infliction of emotional distress. Hilliard expressed claims for a hostile work environment and race discrimination based on a failure to promote. Tatum and Hilliard averred that they were employees of UPS in the Gulf South District and that Williams was the Human Resources Manager of the District; Gramm was the Operations Manager; and Lawrence was the Division Manager of the Capitol Division located in the Gulf South District. Tatum worked in the Port Allen Center, and Hilliard worked in the Harahan Center.
Various pretrial discovery motions were heard and determined. Summary judgment was granted on several claims as to several defendants. The matter was tried by a jury, which dismissed all plaintiffs’ claims.
On appeal, the errors complained of are certain evidentiary rulings, including the trial court excluding certain employees from testifying; in sustaining certain objections at trial; in refusing to permit certain depositions to be read to the jury; and in granting a motion in limine.
|3In the petition, plaintiffs alleged that, during the course of their employment, they were each subjected to unlawful discrimination on the basis of their race. Tatum claimed that he was subjected to retaliation for opposing and making complaints of discrimination and to intentional infliction of emotional distress by Gramm and Lawrence, who, he urged, acted to induce him to withdraw his complaints and forcing him to terminate his employment. According to the complaint, UPS failed to take appropriate remedial action to remedy the situation.
Tatum, an African-American, alleged that, shortly after he became Business Manager of the Port Allen UPS Center, he observed that Lawrence, his immediate supervisor, was treating him and other black employees in a less favorable and respectful manner based on their race, and other managerial employees made similar observations. Lawrence dismissed his concerns, after which time he made his concerns known to Williams. According to the petition, Lawrence, Williams and Gramm retaliated in various ways, culminating in his unwarranted demotion in January 2007.
Hilliard, also African-American, averred that in 2006, he was a part-time Operational Management Supervisor at the Earhart Center, and it had been represented to him that he would have the opportunity to advance to a full-time manager. According to Hilliard, he completed all requirements for full-time employment and submitted the appropriate paperwork to Center Manager Michael Bates (“Bates”), who intentionally failed to forward the package to Human Resources. After questioning by Hilliard, Bates replied, “You people will have to wait.” Hilliard urged that these actions were motivated by racial discrimination, and Bates has demonstrated such behavior in regard to other black and other non-white employees. He further urged that Bates created a racially hostile ^environment that was known to UPS through Williams and Gramm, who allowed the situation to flourish.
Both Tatum and Hilliard alleged that they suffered severe mental anguish, despair, humiliation, loss of income, loss of earning potential, and loss of enjoyment of life.
The petition was later amended to state that the actions of UPS and its other employees led to stress-related physical and emotional symptoms that forced him to take a leave of absence and seek medical care. UPS refused to acknowledge his condition, and after ordering him to provide documentation justifying his absence, considered Tatum “voluntarily separated” from his employment. Tatum contends *1097 that such action resulted in a constructive discharge, and UPS was in violation of La. R.S. 23:967.
On various motions for partial summary-judgment, Tatum’s claims for constructive discharge and intentional infliction of emotional distress were dismissed with prejudice. As a result, Williams, Gramm, and Lawrence were dismissed from the lawsuit. Summary judgment was denied as to Tatum’s claim for race discrimination. The court also granted a motion for summary judgment in favor of UPS, dismissing the racial discrimination claim by Hilli-ard, but denying summary judgment as to Hilliard’s claim of a hostile work environment.
In a judgment dated October 26, 2009, the trial court considered several pre-trial motions in limine. The court excluded a number of items, including the following, from evidence: the affidavit of Curtis Price; evidence regarding the income or other financial information of UPS; any reference to former defendants Lawrence, Gramm, and Williams; allegations of Ramon Phillips; testimony of, or related to, the employment of Oscar Hernandez, Perry Pittman, and Delbert Jarreau, which fell outside the period of Hilliard’s active employment; testimony ^regarding certain Gulfport employees; certain lawsuits against UPS; testimony of certain employees as to Hilliard’s work performance; testimony of Joe Peterson, Kenneth Rodriguez, Terrell Butler, and Floyd Williams; general complaints by employees who will not testify at trial; hearsay testimony regarding these complaints; and evidence regarding resolved union grievances. The court deferred the motions in limine regarding other matters to trial.
The matter proceeded to trial by jury. At the close of the evidence, the jury found the evidence did not show that Hilliard was subjected to a hostile work environment. The jury further determined that Tatum was not intentionally discriminated against by being demoted on the basis of his race, and UPS did not intentionally retaliate against him because he reported in good faith a violation of state law. All claims against UPS were dismissed. Tatum and Hilliard take this timely appeal.
At the trial on the merits, the only defendant left in the suit was UPS. The claims were limited to racial discrimination and retaliation brought by Tatum and hostile work environment brought by Hilliard.
The only issues presented in this appeal relate to certain evidentiary rulings made by the trial court in response to UPS’s motions in limine and at the trial on the merits. In general, Tatum and Hilliard assert the trial court’s rulings on these issues were prejudicial and unduly restrictive.

SUMMARY OF TESTIMONY

TIM TATUM

Tatum testified that he began employment at UPS in 1986, and he worked continuously there until 2007. He was in the Gulf South District for about twelve or fourteen years. He was a driver or “service provider” for about four and a half years; he then moved to customer service as an account executive or sales ^representative. He continued in that position for another four and half years, when he became an on-car supervisor or “center supervisor.” Tatum held that position for about eleven years until he was promoted to a business manager at the Houma and the New Iberia Centers. A business manager answers to the division manager. Division Manager Ron Acoff told Tatum that he was doing a very good job and was looking to promote him. The Gulf South District Manager was Curtis Price. In 2005, Price told Tatum that he wanted Tatum to take on more responsibilities and felt that he would make a good *1098 division manager. There was an offer to transfer him to a center in Port Allen that had a particular computerized system. Tatum was not given a raise or relocated but, rather, was put on “special assignment.” As such, his expenses were reimbursed. Two weeks after being assigned to Port Allen, Hurricane Katrina struck.
Because the New Orleans area buildings were affected, there was an increase of deliveries in the Baton Rouge/Port Allen area, doubling the number of deliveries. There were also driver issues and increased traffic. It was difficult to train new drivers and find them places to live. The supervisors worked long hours. It was March or April before matters began to return to normal.
During that time, Price and Operations Manager Ken Houston stated to Tatum that Port Allen Division Manager Jerry Kattaway was not performing satisfactorily, and he was eventually demoted. In 2005, Tatum received a raise, a bonus, and stock in the company, which is based on the recommendation of the district manager. Tatum’s “Quality Performance Review” score was significantly higher than that of Kattaway. After Kattaway’s demotion, Lawrence became division manager. Whenever there was an error, Lawrence requested a “write up” explaining the deficiency. As business manager, supervisors who worked under |7Tatum were Darren Williams, Darryl McCree, Charlotte Brown, Chris Wooten, Malcolm K., Vicky Smith, Rodney Flowers, and Walter Pen-kins.
Lawrence spent a lot of time in the other centers in her division. Tatum had regular staff meetings with the supervisors, and they also met outside of work to discuss business and personal matters. After Lawrence, Tatum was not allowed to charge these latter meetings to expenses. After a short time, Tatum became concerned when he and Jennifer Taylor, the only black managers in the division, were left out of certain meetings. In conference calls, Lawrence spoke more harshly to them than to the white managers, and her demeanor was aggressive. After asking for some training that the white managers were receiving, he and Taylor were rebuked. Although Tatum previously had an excellent record with UPS, write-ups against him increased dramatically. Lawrence socialized with other white managers. Other black supervisors expressed their concerns that Lawrence was treating them differently than the white supervisors. Based on his own observations as well as that of the other employees, Tatum felt that Lawrence favored white management people.
Tatum approached Lawrence and expressed his concerns and those of the other ten employees, stating that they could work together and resolve the issue. When he did so, Lawrence gestured toward the door and told him he needed to “get out of her office.” Her behavior did not improve after this meeting, but got worse. Tatum next spoke with Human Resource Manager Roman Williams who is also black. Williams decided to have a focus meeting with only the supervisors, excluding Tatum. Williams met with four supervisors, three of whom were black.
Sometime afterward, Lawrence told Tatum to attend a meeting. Williams and Gramm also attended the meeting. At that time, Tatum stated that he would work with Lawrence, but everyone had to be treated fairly and equally. Gramm |sinformed Tatum that he wanted more communication between Tatum and Lawrence. Williams told him that the other supervisors did not want to be held accountable, and Tatum felt the situation had just gotten worse. He believed that he was being told not to discuss the matter. Afterwards, Lawrence’s behavior toward *1099 him continued as before, yet she acted differently with the pre-load manager.
An incident occurred in which a part-time supervisor falsified a document. Lawrence and Tatum met with the employee, who was written up for the action. Lawrence did not object to this outcome. On September 19, 2006, Lawrence asked Tatum to go to New Orleans to meet with Gramm and Williams concerning the incident at which time Lawrence was to explain the situation. Tatum explained that the matter had been handled and the employee disciplined. In response to an inquiry from Gramm, Tatum stated that he did not think communications with Lawrence were going well, and she still treated whites differently from blacks. Gramm answered that the Port Allen facility was not making any gains and that Tatum would be moved to another building. Tatum responded that he did not want to leave and was told to step out. When he returned, Gramm told him he would stay at Port Allen, but he would have to commit to improve his leadership and organizational skills. This consisted of certain items, such as attending all safety meetings and functions, completing safety audits, holding weekly planning meetings in which notes must be taken, etc. Tatum testified that he had had no problems performing most of the functions in the past. Other items included having weekly focus meetings and adhering to the overtime guidelines for part-time supervisors. This latter problem had been addressed at Port Allen, and Tatum was adhering to the guidelines. Tatum felt that the conditions imposed were retaliatory because they did not address the problem. Gramm and Williams did not ^respond when Tatum asked if he was being singled out. The other managers whom Tatum contacted did not have these written elements.
Tatum testified that Lawrence had previously asked him to distort a report to make it look like deliveries actually performed by five people were made by one supervisor.
After this meeting, Tatum felt that he was “destroyed” and his statistics dropped. There were more unscheduled meetings with Gramm and Williams. Tatum finally met with Curtis Price, and explained the situation to him. Price assured him he would not allow discrimination or retaliation. However, Price subsequently became ill and left the district. Tatum filed a complaint with the Equal Employment Opportunity Commission (“EEOC”).
Afterward, his statistics began to improve dramatically. In November, there was another' meeting with Lawrence and Williams. At that meeting, it was noted that there were certain meetings that Tatum had not attended or scheduled because the time of the year in question was during the busy Christmas season. Further, Tatum felt that certain meetings were unnecessary because he felt it was an unreasonable requirement. Other managers told him “they’re trying to get you, Tim.” Among other items, Tatum noted that communications needed to improve between supervisor and division manager, but this was not something for which Lawrence and Williams asked. Overall, there were improvements, but there was to be another meeting in thirty days.
On January 3, 2007, Tatum, who had a doctor’s appointment for illness, was told he had to attend another meeting with Lawrence and Williams that day. Among the usual points of interest, Tatum noted that he should have followed up with Lawrence with reference to a driver’s injury. After the meeting, Lawrence told Tatum he had made no improvements and would be demoted “for lack of | ^communication.” He was made a supervisor in another center and, in his place, Kevin Pihl, the under-performing pre-load manager, was ap *1100 pointed. Tatum had previously asked to work in pre-load, in order to help with the problems there, but Lawrence refused. After that meeting, Tatum did not return to work. He was neither physically nor emotionally able to do so. Tatum sought medical help for his problems. In March of 2007, he received a letter from UPS requiring him to provide documentation justifying his absence or he would be considered to have “voluntarily” separated from the company.

RICHARD HILLIARD

Hilliard also testified at trial. His testimony shows that he applied to UPS in October 2005 after he returned to the New Orleans area following Hurricane Katrina. He did very well on the tests for employment and was told to return in January. Hilliard explained that he was told that UPS wanted to hire him as a regular employee after the holiday rush was over because of his prior work experience, training, and test scores. Hilliard returned to UPS in early 2006 and was offered a supervisor position to be part time at first and later to become a full-time job. Initially, Hilliard worked twenty-five to thirty hours a week at the Earhart Center of the Gulf South District. His responsibilities were direct communication with drivers. His hours were in the afternoon from about 4 to 9:30.
The business manager of the Earhart Center was Bates. Hilliard testified that, on his first day of employment, he went to see Bates. Hilliard introduced himself and reached out his hand to shake. However, Bates did not look up. Instead, Bates said, “you don’t belong here and shut the door behind you.” Hilliard returned to his car to compose himself and called Sherry Anderson, the UPS | urepresentative who hired him, to report the incident and to get some advice on how to proceed.
Anderson called back a few minutes later and told Hilliard to go back in and ask for Terry Trommel. Trommel brought Hilliard back into Bates’ office. Bates had his head down and did not look up. Trom-mel told Bates that he was notified by email and verbally that Hilliard was reporting for work as a new supervisor. Bates did not respond. Trommel took Hilliard to his new office and apologized for Bates’ behavior.
Hilliard testified that he worked with other supervisors and his immediate supervisor, Cliff Dreyfus, all of whom were Caucasian. Hilliard is African-American. Hilliard loved his job and in six months, after a favorable evaluation by Dreyfus, Hilliard received a pay increase. However, Hilliard stated that he did not enjoy the work environment because Bates was a racist and treated white workers better.
Hilliard testified that Bates tried to divide the white drivers from the other drivers during the first thirty days of the probation period for employment. Bates started new black drivers off with 120 to 140 stops per day; but, new white drivers were only given 50 to 60 stops per day. Consequently, the white drivers would normally get back between 4:30 and 5:00 pm, while the black drivers would not get back until much later in the evening. When black drivers would call in for help, Bates would refuse and yell at the drivers to “get your ass out there and you don’t call for no help.” However, when white drivers would call in, Bates would send the help they requested.
Part of Hilliard’s job was to send drivers back out at the end of the day with packages that were left in the building. Bates would always send out a black driver, and let the white drivers go home. Hilliard maintains that Bates’ favorite |12saying was, “I’m going to fire your ass.” At the end of the day, Bates would come into the area of Hilliard’s office and speak only to the white drivers, never to the black driv *1101 ers. Hilliard testified that it was noticed and commented on by both black and white drivers.
On one occasion, Hilliard was bringing his daily reports to Bates’ office. He overheard Bates asking his supervisor, Dan Kulceski, “why we got so many n-drivers in here, where is all the good wholesome white boys.” On another occasion, Hilliard witnessed an incident between Bates and a driver named Leslie Berry. Bates came in as Berry was getting out of his truck. Bates was angry and told Berry that if he ever disobeyed an order “his black ass is fired.”
Hilliard personally experienced Bates’ prejudice. Hilliard testified that every evening Bates would come into the area and say goodnight to all of the other supervisors who were white, then pass right by Hilliard without saying a word. One night Hilliard said goodnight to Bates, but Bates did not respond, he simply walked out of the building. Hilliard asked his supervisor, Cliff Dreyfus why Bates behaved the way he did. Dreyfus advised Hilliard to just stay out of Bates’ way. Hilliard confronted Dreyfus, asking why he allowed this to go on. Dreyfus indicated that he was too close to retirement to cause any trouble.
Hilliard also testified that he informed Sherry Anderson that Bates was a racist and that Dreyfus knew about the problem but would say nothing. Hilliard explained that he told Anderson of the problem in response to her question about why there were so many drivers leaving the Earhart Center.
Hilliard also testified that he was only cleared for training when he complained to Terry Trommel that Bates was scheduling the other supervisors for training and leaving Hilliard out.
| isln July of 2006, Hilliard applied for a promotion. He hoped to get a full-time position at a different center. Hilliard completed the necessary forms and forwarded them to Bates for completion. Hilliard also sent a letter to Edward Wilfred at the General Office. According to Hilliard’s testimony, the next step in the process was that the General Office would send a promotion packet to Bates for completion. That packet was sent to Bates on July 14, 2006 with instructions to Bates to complete his assessment of Hilliard’s application and return the packet within ten days of receipt. Hilliard received a copy of the packet.
Hilliard went into Bates’ office to inform him of the promotion request. Bates had the packet at that time. Bates stated that he wished to become a full-time specialist. Claston LeBlanc, the security officer, was in Bates’ office at the time. LeBlanc told Hilliard he should become an on-road supervisor rather than stay in an office all day. Bates told Hilliard to think about that position. Hilliard left, but he returned later to tell Bates he still wanted to become a specialist. Bates told Hilliard to fill out a portion of the packet and sign his name where indicated. Hilliard complied.
Subsequently, Hilliard asked Bates if he had completed and turned in the promotion package. Bates simply ignored him and did not respond. Hilliard asked again a few days later and Bates’ response was “you people have to wait.” On July 27, 2006, Hilliard wrote asking Bates to send off his packet. When he got no response, Hilliard wrote a second note on August 2, 2006 again requesting that Bates complete and mail the promotion packet.
Hilliard called Sherry Anderson in Human Resources for help. Anderson told Hilliard she would call Bates and ask him to complete the forms. Anderson and Hil-liard spoke twice, but still there was no response from Bates. Hilliard then called Learning and Development Manager Wilfred Edwards for help. Edwards *1102 | indicated that he knew of the situation from Anderson and assured Hilliard that he would speak to Bates. However, the packet was still not completed. Finally, on August 20, 2006, Hilliard wrote a letter to the corporate headquarters in Atlanta explaining the situation and alleging racial bias by Bates. Hilliard sent a copy to Bates.
Shortly afterward, Ray Waguespack from Human Resources visited Hilliard and suggested the incident was a misunderstanding and suggested that Hilliard might want to transfer to another center. Hilliard insisted that it was not a misunderstanding and that transferring him to another center would not solve the problem of Bates’ racial discrimination. Although Waguespack suggested the two meet away from the UPS building, Hilliard refused to meet Waguespack outside of the office. About a week later, Hilliard was called into a meeting with Bates, Wagues-pack, and Division Manager Dan Kulceski.
At Kulceski’s prompt, Bates mumbled something that could have been an apology. Bates and Waguespack left, leaving Hilliard alone in the room with Kulceski. Kulceski told Hilliard he was new and did not know Bates very well, but he would look into the situation.
Subsequently, Hilliard was called into a meeting with Waguespack and Anderson. Waguespack read some of the UPS policies against racial discrimination and discussed the problem Hilliard was having with Bates. Hilliard told Waguespack there was a racially hostile work environment at the Earhart Center. Waguespack suggested that it was just a misunderstanding. Hilliard assured Waguespack that it was not. Waguespack then stated that it may be bad management. Hilliard told Waguespack that Bates had approached three black drivers and asked them to set up a committee of black drivers to help Bates effectively communicate with them. Waguespack commented that could be a good |1sthing. Hilliard’s response was “there was nothing good about that statement.” Hilliard’s opinion is that the suggestion that a center manager single out one ethnic group when his job is to communicate with everyone was improper and shows that Bates had a racial bias when communicating with his employees. Waguespack asked Hilliard if he wanted to be transferred to another center. Hilli-ard’s response was no.
The next day, Hilliard called Wagues-pack to tell him the meeting was a disappointment. Hilliard also told Waguespack that he did not address the issues of racism and that Hilliard would feel better with someone else from corporate handling the complaint. Waguespack read a section of the UPS policy book and told Hilliard he needed “something to work with” and asked Hilliard to find others who had been subjected to Bates’ discrimination. Hilli-ard stated that was not his responsibility and walked out of this meeting angry.
Hilliard testified that the next day he made the decision to seek counsel. He also called Waguespack to tell him of the dissatisfaction with the response and would wait to speak to someone from corporate. Waguespack responded that the evaluation for the promotion that Hilliard asked for was going to happen on Monday. Hilliard was very upset and suggested to Waguespack that the process could not be fair until things with Bates were corrected. Waguespack responded that if Hilliard did not want the packet completed he needed to put that in writing. Otherwise, the evaluation would proceed. Hilliard was very angry and hung up the phone.
On September 18, 2006, Hilliard wrote a letter to the corporate headquarters complaining that Waguespack did not properly investigate his complaint and made “disturbing comments and suggestions.” The *1103 letter detailed his relationship with Bates and his observations of Waguespack, whom Hilliard suspected “was trying | ifito get rid of me ... or cover up my complaints” because of his close working relationship with Bates.
Subsequently, UPS Human Resources Manager Roman Williams came to see Hil-liard. Williams, who is African-American, talked with Hilliard for a while about general topics, but he did not mention any of Hilliard’s complaints. Hilliard testified that, at this point, he “could not take anymore.” On October 3, 2006, Hilliard called Cliff Dreyfus and told him “that’s it for me, I can’t come back in that building again.” Dreyfus gave Hilliard a leave of absence. Hilliard never-returned to UPS. On October 6, 2006, Hilliard filed a complaint with the EEOC that was later withdrawn. He officially resigned on February 18, 2006 and filed this lawsuit at that time.
On cross-examination, Hilliard admitted that, during his nine and one-half months as a part-time employee at UPS, he barely spoke to Bates and that Bates never directed a racial slur to him. Hilliard further admitted that, although he overheard Bates use the N word in a conversation with Kulceski, he never reported the incident to anyone at UPS.

LAW AND ANALYSIS

La. R.S. 23:332(A) makes it unlawful for an employer to:
(1) Intentionally fail or refuse to hire or to discharge any individual, or otherwise to intentionally discriminate against any individual with respect to his compensation, or his terms, conditions, or privileges of employment, because of the individual’s race, color, religion, sex, or national origin.
(2) Intentionally limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities, or otherwise adversely affect his status as an employee, because of the individual’s race, color, religion, sex, or national origin.
To prevail in a hostile environment racial harassment action against an employer, the plaintiff must prove five elements:
117(1) the employee belonged to a protected group;
(2) the employee was subjected to unwelcome harassment;
(3) the harassment was based on the race of the employee;
(4) the harassment affected a term, condition, or privilege of employment; and
(5) the employer knew or should have known of the harassment and failed to take proper remedial action.[1]
La. R.S. 23:967 provided in pertinent part as follows:
A. An employer shall not take reprisal against an employee who in good faith, and after advising the employer of the violation of law:
(1) Discloses or threatens to disclose a workplace act or practice that is in violation of state law.
(2) Provides information to or testifies before any public body conducting an investigation, hearing, or inquiry into any violation of law.
(3) Objects to or refuses to participate in an employment act or practice that is in violation of law.
B. An employee may commence a civil action in a district court where the violation occurred against any employer who engages in a practice prohibited by Subsection A of this Section. If the court finds the provisions of Subsection *1104 A of this Section have been violated, the plaintiff may recover from the employer damages, reasonable attorney fees, and court costs.
To establish a prima facie case for retaliation, the plaintiff must prove by a preponderance of the evidence that: (1) he (or she) engaged in an activity protected by Title VII; (2) an adverse employment action occurred; and (3) a causal link existed between the protected activity and the adverse employment action.[2] A tangible employment action is defined as “a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.”[3] | ^Discharges and demotions as a result of adverse employment actions prohibited by the above statute are not the only actions the federal courts consider in retaliation cases. Also included in this category are employment actions that include a reduction of opportunities.[4]
Relevant evidence is evidence having any tendency to make the existence of any fact that is of consequence to the action more probable or less probable than it would be without the evidence.[5] Whether evidence is relevant is within the sound discretion of the trial court and an appellate court will not disturb that ruling in the absence of clear abuse of discretion.[6]
Interlocutory rulings on motions in limine, and other evidentiary rulings are reviewable on appeal subject to the provisions of La. C.C.P. art. 1636.[7] However, the evidence excluded by the trial court below must be available for our appellate review.[8] In order for this Court to review evidence excluded by the trial court either in trial or in a motion for limine, the party must comply with La. C.C.P. art. 1636 to preserve the evidence. It is well settled that error may not be predicated upon a ruling that excludes evidence unless a substantial right of a party is affected and the substance of the evidence was made known to the court by counsel.[9] In those instanc *1105 es, it is incumbent upon the party who contends his evidence was | ^improperly excluded to make a proffer, and if he fails to do so, he cannot contend such exclusion was erroneous.[10]

RICHARD HILLIARD

Three assignments of error relate to evidentiary rulings in Hilliard’s cause of action for hostile work environment. Specifically, Hilliard argues the trial court erred in excluding the testimony of Gulf-port, Mississippi UPS employees in the pre-trial ruling on the motion in limine. Bates was the Earhart Center manager when Hilliard was employed at that facility in 2006 and later became the manager at Gulfport.
Hilliard argues that the exclusionary error was compounded when, at trial, the defense opened the door to testimony relating to Bates’ conduct after he was relocated to the Gulfport Center. Hilliard asserts he should have been allowed to read the depositions of two of the Gulfport employees, Terrell Bang and Arthur Spann, to the jury. In another assignment of error, Hilliard argues the trial court erred in excluding the testimony of Oscar Hernandez, an Earhart Center employee, on the grounds that the racial discrimination case had been settled on summary judgment.
Prior to trial, Hilliard intended to introduce the testimony of several UPS workers, including Terrell Bang and Arthur Spann, to show that Bates continued his discriminatory behavior after his transfer to the Gulfport Center in Mississippi in 2007. In the pre-trial ruling on the motions in limine, the trial court granted UPS’s motion to exclude testimony from the Gulfport witnesses on the basis that Hilliard was never employed in the Gulf-port Center, and any events testified to by these employees happened after Hilliard left his employment with UPS. Bates was transferred to the Gulfport Center after Hilliard left his employment with UPS.
On appeal, Hilliard concedes that Bang and Spann’s testimony is the only testimony now at issue. At trial, during Hilliard’s cross-examination of Dan Kulce-ski, the trial court allowed Hilliard to question Kulceski as to whether he received complaints of racial discrimination against Bates made by Arthur Spann, Dina Benoit, and Terrell Bang, all of whom were employed in the Gulfport Center.
Hilliard asserts Bang and Spann’s testimony should have been allowed to show Bates creates a hostile work environment at any center to which he is assigned. Thus, Hilliard argues the conditions at the Gulfport Center are relevant to prove a necessary element of Hilliard’s claim of hostile work environment, regardless of whether or when Hilliard worked at the Gulfport Center. There was no proffer of evidence or testimony offered regarding the Gulfport employees.[11] With regard to the testimony of these employees, this issue has not been preserved for appeal.
At the end of trial, Hilliard re-urged his argument that Kulceski’s cross-examination opened the door to admission of Bang and Spann’s depositions. UPS re-urged its objection, and the court determined the depositions were inadmissible. At this point, counsel for Hilliard admitted there was no time to read the depositions and asked that the depositions be “released from their proffer, so they can be *1106 given to the jury.” That request was denied by the trial court. We find no error in that latter ruling, as such is forbidden by La. C.C.P. art. 1794(B).
In his next assignment of error, Hilliard avers the trial court erred in granting the motion in limine as to the testimony of Oscar Hernandez. Hilliard asserts the trial court made that decision based on the fact that Hilliard’s racial discrimination action was no longer viable. However, we note that the written | adjudgment on the motion in limine indicates this testimony was excluded because it falls outside of the time period of Hilliard’s active employment at UPS. Although the initial decision of the trial court at the motion in limine excluded this evidence, essential parts of Hernandez’s letter were read to the jury at trial.
Hilliard’s main complaint to support his allegation of hostile work environment was that Bates did not timely fill out and submit the promotion package. Hilliard testified that the package was ultimately submitted, and Bates offered an insincere apology, although the action was taken only after Hilliard made several complaints to supervisors. In Bates’ testimony in which he denied any racial discrimination, he also denied any intentional delay in completing Hilliard’s packet for promotion. During cross-examination, Hilli-ard attempted to impeach Bates’ testimony with the affidavit of Irving Washington, a driver at the Earhart Center who stated that Bates was a racist and treated black workers less favorably than whites. That affidavit cited no specific incidents of discrimination. Further, Washington testified at trial. This testimony confirms the statements to which Washington attested. His belief is that Bates is a racist, who treats whites better than blacks who work for him. The testimony was a generalization of how employees were treated without any specifies.
Wilfred Evans testified that he is the Human Resources Workforce Planning and Learning and Development Manager. The process for promotion has four evaluation processes that start with a letter of interest by the candidate, which Hilliard submitted. That is followed by a packet for an initial assessment to the candidate’s manager. UPS returned such a packet to Hilliard. The packet was supposed to be returned within ten days, but that was just a “goal,” and it is common to go beyond that time range. Employee Relations Manager Ray Waguespack informed Evans that there was a complaint that Hilli-ard’s packet hadjjgnot been turned in. Evans called Bates and told him to get the packet in, as it was overdue. Evans could not remember how long it was before the packet was received in his office. In Evans’ testimony, he stated that Bates had not done anything to make him feel that Bates discriminated against black people.
Hilliard also read portions of a letter signed by about sixteen employees of the Earhart Center who were employed under Bates’ management. The letter is contained in the record and gives some general allegations that Bates did not sympathize with the black drivers as much as he did with the white drivers. Portions of it were read to the jury, as follows: “We as black drivers feel strongly that Mr. Bates has neither concern or [sic] consideration for us. It’s just one racist act after another, and it’s time for UPS to take action and put a stop to Mr. Bates’ racist acts and statements.”
Further, on cross-examination of Bates, Hilliard read portions of Hernandez’s affidavit, which states:
Michael Bates last act of negligence towards me was his inexcusable reason as to why he lost my promotion packet last year. If I had not asked him for *1107 the package, I would have never known that he lost such package.
After I contacted Human resources to find out the status of my packet, I asked Michael Bates why he lost my packet. His response, well, maybe I don’t want to promote you people. I asked him what he meant by that, and he recanted by saying, well, maybe the packet wasn’t ready.
I filed a complaint with Human Resources, and again Mr. Bates was not held accountable. Yet I was working under the constant threat of being dismissed by him just because he has issues against minorities....
We find this evidence may have been relevant to the issue of whether UPS knew or should have known of the harassment and failed to take proper remedial action, an element of proof in an action for hostile work environment. The action regarding Hernandez’s promotion packet is very similar to the allegations made by | ^Hilliard. Again in this instance, however, Hilliard did not preserve Hernandez’s testimony for our review by way of a proffer.
Nevertheless, because the jury had the benefit of hearing the gist of the allegations made against Bates by Hernandez, and the letter was admitted into evidence, we find, even if the testimony had been proffered, any error would have been harmless.

TIM TATUM

The final assignment on appeal relates to Tim Tatum. Tatum complains that the court erred in granting UPS’s objections to his attempt to testify concerning the complaints made to him by the other supervisors beneath him in the chain of command; and in granting the objections to the testimony of the supervisors themselves. At the motion in limine, UPS had objected to this evidence, and the trial court deferred a ruling on the issue to trial. At trial, Tatum attempted to testify as to specific complaints by other employees regarding the fact that the problems with Lawrence were widespread. UPS re-urged its objection to this testimony, stating that the matter was not a class action case but simply Tatum’s suit. The trial court sustained the objection. Tatum did not object to the ruling. He then testified that a number of black supervisors had expressed concerns to him about disparate treatment. After another objection from UPS, the trial court stated, “Let’s just get this one out and then move on.” Counsel for Tatum replied, “That was the only question I wanted to ask.”
Later in the trial, Tatum called Package Center Supervisor Darrin Williams at the Hammond UPS facility. Darrin Williams had been the on road supervisor at Port Allen from February 2005 through August 2007, during Tatum’s time there. Tatum presided over daily business meetings, and Darrin Williams felt that he was a very good business manager. Lawrence had once instructed them to change 124Ínformation to make it appear as though one service provider had made deliveries rather than four, and Williams refused to do so. At one point, Darrin Williams complained to Tatum that Lawrence showed favoritism according to race and held them to a different level of accountability. The black supervisors were asked to take a lot of responsibilities of the others, and had the white employees do other things, yet hold the black supervisors accountable even if they were not involved. Lawrence constantly threatened their jobs. There was more than one discussion on this situation.
Darrin Williams, McCree, Roman Williams, and two other black supervisors met to discuss these concerns. Darrin Williams told Roman Williams that Law *1108 rence had an issue with race and gave him specific examples. Roman Williams said he would look into everything. Darrin Williams filed a complaint against Lawrence for integrity, describing incidents in which Lawrence had deliberately misclassified a work injury as well as a work-related property loss. Darrin Williams had observed Kevin Pihl and felt he was not capable of doing his job, with as many as 100 packages a day being misloaded. Darrin Williams complained about this to Tatum, and the problem was discussed with Lawrence. After Pihl was made business manager, Lawrence did not require him to have daily meetings and was given more leeway. After Tatum left, performance dropped off. Pihl was eventually demoted. Darrin Williams testified that he was transferred from Port Allen partially because of complaints made against him involving preferential treatment. He believed the complaints had no merit and that he was transferred as retaliation for reporting Lawrence.
Darrell McCree testified that Tatum was his supervisor at Port Allen. McCree, an African-American, complained to Tatum that he was being treated differently than the white supervisors, that she held him accountable for 1 ^things that were not his responsibility, and always talked about firing him. She did not talk to the white supervisors like that. In a focus meeting involving himself, Darrin Williams, Chris Wooten, Walter Hankins, and Roman Williams, McCree told of examples of racial discrimination. Although Williams said he would take care of it, McCree never heat'd back from him. McCree testified to an incident where Lawrence said a black driver that he could not wear his raincoat because it was not a UPS color, but a white driver with a different color coat was seen by Lawrence and allowed to leave. Further, McCree testified that the white drivers could go straight to Lawrence and complain rather than going through their supervisors. The black drivers were made to talk to their supervisors. One driver, Kenny Lawrence, complained to Jeanne Lawrence that he wanted his number of stops to decrease; Jeanne Lawrence gave these extra stops to two black drivers.
Contrary to Tatum’s assertions, the jury heard specific testimony regarding the “picture of racial hostility” created by Jeanne Lawrence and the actions and/or inactions of Roman Williams and Karl Gramm. Despite the determination of the trial court to defer ruling on this category of testimony at trial, Tatum did not attempt to call any other supervisors who made complaints to him, nor was other evidence on this issue proffered. The jury had the opportunity to evaluate the evidence relevant to Tatum’s claims of employment discrimination and retaliatory or reprisal actions under the “whistleblower” statute, La. R.S. 23:967. This assignment of error is without merit.
For the foregoing reasons, we affirm the judgments on appeal.

AFFIRMED

. Chaney v. Home Depot, USA, Inc., 05-1484 (La.App. 4 Cir. 8/16/06), 940 So.2d 18, 22.

. Hanley v. Doctors Hosp. of Shreveport, 35,-527 (La.App. 2 Cir. 6/6/02), 821 So.2d 508, 519.

. Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761, 118 S.Ct. 2257, 2268, 141 L.Ed.2d 633 (1998).

. Edwards v. Bd. of Regents of the Univ. of Ga., 2 F.3d 382 (11th Cir.1993).

. La. C.E. art. 401.

. Kim v. Kim, 07-318 (La.App. 5 Cir. 10/30/07), 970 So.2d 1158.

. A. When the court rules against the admissibility of any evidence, it shall either permit the party offering such evidence to make a complete record thereof, or permit the party to make a statement setting forth the nature of the evidence.
B.At tire request of any party, the court may allow any excluded evidence to be offered, subject to cross-examination: on the record during a recess or such other time as the court shall designate; or by deposition taken before a person authorized by Article 1434 within thirty days subsequent to the exclusion of any such evidence or the completion of the trial or hearing, whichever is later. When the record is completed during a recess or other designated time, or by deposition, there will be no necessity for the requesting party to make a statement setting forth the nature of the evidence.
C. In all cases, the court shall state the reason for its ruling as to the inadmissibility of the evidence. This ruling shall be reviewable on appeal without the necessity of further formality.
D. If the court permits a party to make a complete record of the evidence held inadmissible, it shall allow any other party the opportunity to make a record in the same manner of any evidence bearing upon the evidence held to be inadmissible.

. Galloway v. Lolley, 44,501 (La.App. 2 Cir. 8/19/09), 17 So.3d 479.

. La. C.E. art. 103(A)(2).

. Goza v. Parish of West Baton Rouge, 08-0086 (La.App. 1 Cir. 5/5/09), 21 So.3d 320, writ denied, 09-2146 (La.12/11/09), 23 So.3d 919, cert. denied, - U.S. -, 130 S.Ct. 3277, 176 L.Ed.2d 1184 (2010).

. Although counsel maintains the depositions of Spann and Bang were proffered, the transcript shows no proffer was made.