# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 16-30903

United States Court of Appeals
Fifth Circuit

**FILED**

February 2, 2018

Lyle W. Cayce
Clerk

LORI RAYBORN,

> Plaintiff - Appellant

v.

BOSSIER PARISH SCHOOL BOARD, erroneously referred to as Bossier Parish School System; NICHOLE BOURGEOIS, in her personal and official capacity; GINGER HUGHES, in her personal and official capacity; ACE AMERICAN INSURANCE COMPANY,

> Defendants - Appellees

Appeal from the United States District Court
for the Western District of Louisiana

Before DENNIS, CLEMENT, and GRAVES, Circuit Judges.

EDITH BROWN CLEMENT, Circuit Judge:

We decide whether the district court erred when it granted summary judgment against Appellant Lori Rayborn on her claims of (1) retaliation under Louisiana state law and the First Amendment, (2) deprivation of her liberty and reputational interests under the Fourteenth Amendment, and (3) intentional infliction of emotional distress. We AFFIRM.

## FACTS AND PROCEEDINGS

Rayborn worked as a nurse at Parkway High School ("Parkway") within the Bossier Parish School System ("BPSS"). Her children attended Parkway,

No. 16-30903

and for many years she achieved the highest possible performance reviews for her service. In 2011, a diabetic student, HDC, committed suicide because of her classmates' bullying. As the school nurse, Rayborn had worked closely with HDC to monitor her diabetes and provide her with medical care. Rayborn documented fluctuations in HDC's glucose levels and increased frequency of hypo/hyperglycemia in the months before the suicide.

Rayborn testified that she recommended to BPSS's 504 coordinator[1] that HDC receive special accommodations, but her suggestion was apparently ignored. Sometime before the suicide, HDC informed Rayborn that she was uncomfortable receiving a profile in the school's yearbook as a student with a disability. Rayborn passed HDC's concern along to the administration, and HDC was not required to participate in the yearbook's plan. HDC later informed Rayborn that her substitute teacher had forbidden her to monitor her glucose levels in class. Rayborn brought this to the teacher's attention and explained that HDC had a health plan with which the school was legally obligated to comply. HDC's teachers received emails from Rayborn, reminding them of HDC's health plan and instructing them to print a hard copy of the plan for substitute teachers. About a week before HDC's death, Rayborn treated HDC for high glucose levels. Rayborn took notes of all of her interactions with HDC.

After her suicide, HDC's parents sued the Bossier Parish School Board ("BPSB"). Rayborn's notes were subpoenaed as part of that action. Bourgeois and Ginger Hughes, Rayborn's supervisor, each met individually with Rayborn to discuss the notes' contents before responding to the subpoena. Rayborn

---

[1] Section 504 is a part of the Rehabilitation Act of 1973, codified at 29 U.S.C. § 701, that is intended, in part, to assist disabled students. BPSS has a coordinator who ensures compliance with section 504 requirements, sometimes by creating health plans for students.

explained that the school's failure to put HDC on a 504 plan raised concerns.[2] Rayborn expressed other concerns and safety issues, pointing to a number of "red flags" with the school's handling of HDC's health needs.

By the end of these meetings, Hughes and Bourgeois's demeanors had changed. They appeared "alarmed" and "distant and distracted." Hughes said Rayborn's concerns reflected poorly on the school system. Rayborn claims that these administrators treated her differently after the meetings. Bourgeois gave Rayborn "cold stares," avoided conversing with her, and was less talkative around her. Rayborn overheard Bourgeois mocking her by reading aloud in an effected tone a work-related email that Rayborn had circulated to the staff.

Rayborn also had problems with a medically-trained secretary, Michelle Barger. Hughes issued a verbal reprimand to Rayborn for one particularly bad confrontation with Barger that occurred in front of students and parents, and Hughes informed Rayborn that she had discussed an involuntary transfer with Bourgeois. According to Rayborn, Hughes specified that the reprimand was issued in part because she did not give the administration "wiggle room." Hughes further stated that Rayborn's practice of voicing her concerns was becoming a problem and that she needed to be a "professional."

Near the end of a school administration meeting addressing medication management and documentation and other health-related issues, a question was posed regarding whom to contact in the event of a medical emergency. Bourgeois announced that whether a nurse was present or not, any response to a medical emergency should be referred to 911. Later, a student passed out in the cafeteria. Nobody informed Rayborn, who was in her office, until after 911 had been called and other medical professionals had arrived on the scene.

---

[2] Bourgeois responded that HDC did not need a 504 plan because "she was stable with good grades." Bourgeois also questioned, "what does a nurse have to do with 504."

No. 16-30903

Upset, Rayborn went to Bourgeois's office and protested her exclusion from the medical emergency, arguing that her absence jeopardized children's safety and lives. Bourgeois said, "[w]e didn't need you" and reminded her of the meeting in which she had decided 911 would be called whether the nurse was on campus or not. Rayborn exited Bourgeois's office repeating, "unbelievable." *Id.*

After that incident, Hughes reprimanded Rayborn again and issued her a mandatory transfer to another school within the BPSS. Hughes informed Rayborn that she agreed with Rayborn about student safety, but she could not condone "insubordinate" conduct. Rayborn's transfer was effective immediately and she was not allowed to return to Parkway without an escort.

Rayborn found the transfer unsatisfactory. She was no longer at Parkway with her children and she had a list of concerns regarding the facilities at her new school. Rayborn's pay and benefits, however, remained unchanged.

Rayborn filed two grievances, but BPSB took no formal action. Rayborn claims Hughes subsequently issued a false evaluation of Rayborn, accusing her of excessive absences and failure to complete a proposed wellness program. Within a few months of the transfer, Rayborn resigned and found work elsewhere because she "was afraid to go back. They had forced [her] out of [her] job."

Rayborn sued BPSB, and its insurance provider, Ace American Insurance Company, as well as Bourgeois and Hughes in their official and individual capacities (collectively, "Defendants"). She claimed Defendants were liable under 42 U.S.C. § 1983 for retaliating against her for expressing her views about the administration's inadequacies in handling various medical emergencies—including the suicide of HDC—in violation of the First Amendment. She also claimed Defendants impugned her liberty and reputational interests in violation of the Fourteenth Amendment. Finally, she

4

No. 16-30903

claimed BPSB violated the Louisiana whistleblower law and Defendants' actions amounted to intentional infliction of emotional distress.

The district court granted summary judgment in favor of Defendants on all of Rayborn's claims. She timely appealed.

## STANDARD OF REVIEW

We review "a grant of summary judgment *de novo*, applying the same standard as the district court." *Rivera v. Hous. Indep. Sch. Dist.*, 349 F.3d 244, 246 (5th Cir. 2003). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "In deciding whether a fact issue exists, courts must view the facts and draw reasonable inferences in the light most favorable to the nonmoving party." *Wilson v. Tregre*, 787 F.3d 322, 325 (5th Cir. 2015). We "may affirm the district court's summary judgment on any ground raised below and supported by the record." *Id.* (quoting *Rogers v. Bromac Title Servs., L.L.C.*, 755 F.3d 347, 350 (5th Cir. 2014)).

## DISCUSSION

### I. Louisiana Revised Statute § 23:967

Rayborn first challenges the district court's dismissal of her state-law[3] whistleblower claim under Louisiana Revised Statute § 23:967.[4] Rayborn

---

[3] The district court exercised its discretion to maintain supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over her state-law claim. *See Del-Ray Battery Co. v. Douglas Battery Co.*, 635 F.3d 725, 731 (5th Cir. 2011).

[4] The statute states:

An employer shall not take *reprisal* against an employee who in good faith, and after advising the employer of the violation of law: (1) Discloses or threatens to disclose a workplace act or practice that is in violation of state law. (2) Provides information to or testifies before any public body conducting an investigation, hearing, or inquiry into any violation of law. (3) Objects to or refuses to participate in an employment act or practice that is in violation of law.

contends that the district court erred when it used federal jurisprudence associated with Title VII to analyze her claim under the Louisiana whistleblower statute. As Rayborn points out, this court has noted that "§ 23:967 seems to offer broader protections" than Title VII. *Schroeder v. Greater New Orleans Fed. Credit Union*, 664 F.3d 1016, 1026 (5th Cir. 2011). Nonetheless, our precedent, and that of the Louisiana state courts, has consistently cited to Title VII standards in interpreting § 23:967. *See Strong v. Univ. Healthcare Sys., L.L.C.*, 482 F.3d 802, 805 n.1 (5th Cir. 2007) ("the standards governing both claims [under Title VII and § 23:967] are materially indistinguishable"); *Smith v. AT&T Sols.*, 90 F. App'x 718, 723 (5th Cir. 2004) ("[w]hile the Louisiana Supreme Court has not spoken directly on whether [Title VII's] framework applies to section 23:967 cases, Louisiana courts have often looked to federal anti-discrimination jurisprudence in interpreting Louisiana's anti-discrimination statutes"); *Imbornone v. Treasure Chest Casino*, No. 04-2150, 2006 WL 1235979, at *3 (E.D. La. May 3, 2006); *Tatum v. United Parcel Serv., Inc.*, 79 So. 3d 1094, 1103–04 (La. Ct. App. 2011). Rayborn provided no Louisiana cases interpreting § 23:967 otherwise. Accordingly, we apply the standards and requirements of Title VII when analyzing her retaliation claims under § 23:967.

Applying federal Title VII standards, Rayborn's claim under § 23:967 fails. An employee "establishes a prima facie case for unlawful retaliation by proving (1) that she engaged in activity protected by Title VII, (2) that an

---

La. Stat. Ann. § 23:967(A)(1)–(3) (emphasis added). The statute defines "reprisal" as

firing, layoff, loss of benefits, *or any discriminatory action* the court finds was taken *as a result of an action* by the employee . . . ; however, nothing in this Section shall prohibit an employer from enforcing an established employment policy, procedure, or practice or exempt an employee from compliance with such.

*Id.* (C)(1) (emphasis added).

6

adverse employment action occurred, and (3) that a causal link existed between the protected activity and the adverse employment action." *Long v. Eastfield Coll.*, 88 F.3d 300, 304 (5th Cir. 1996) (citing *McMillan v. Rust Coll., Inc.*, 710 F.2d 1112, 1116 (5th Cir. 1983)). For the purposes of § 23:967, an adverse employment action "is defined as 'a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Tatum*, 79 So. 3d at 1104 (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)).[5]

Rayborn's claim fails because she cannot show an adverse employment action. Rayborn claims that she was transferred and reprimanded because of her protected activity, and she further argues that she effectively received a constructive discharge.

This court has said that "a transfer or reassignment can be the equivalent of a demotion [which is a significant change in employment status], and thus constitute an adverse employment action." *Thompson v. City of Waco*, 764 F.3d 500, 503 (5th Cir. 2014) (citing *Alvarado v. Tex. Rangers*, 492 F.3d 605, 612–15 (5th Cir. 2007)). "To be the equivalent to a demotion, a transfer need not result in a decrease in pay, title, or grade; it can be a demotion if the new position proves objectively worse—such as being less prestigious or less

---

[5] In 2006, the Supreme Court issued *Burlington North Santa Fe Railway Co. v. White*, in which the Court rejected limiting Title VII retaliation claims to "ultimate employment actions," such as "hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." 548 U.S. 53, 64-67. Instead, the Court found that Title VII retaliation "is not limited to discriminatory actions that affect the terms and conditions of employment." *Id.* at 64. Despite being five years after *Burlington*, the *Tatum* court cited a pre-*Burlington* standard in addressing retaliation under § 23:967. *See* 79 So. 3d 1094, 1104. It is unclear if the *Tatum* court did so intentionally. Nonetheless, we have found no Louisiana state case applying the *Burlington* standard to a § 23:967 claim and therefore we follow the *Tatum* court's lead in applying a pre-*Burlington* standard.

interesting or providing less room for advancement." *Id.* (quoting *Alvarado*, 492 F.3d at 613 (alterations omitted)). Rayborn's transfer to another school within the BPSS is not an adverse employment action. She did not lose any pay or benefits. There is no evidence that she suffered a loss of responsibilities. Although her office facilities at the new school were subjectively less desirable, and she no longer worked at the school her children attended, these differences do not amount to a demotion. Thus, she did not suffer a significant change in employment status.

Moreover, the evidence does not support Rayborn's allegation that BPSB constructively discharged her. To show constructive discharge in Louisiana, a plaintiff must show that "the employer intended to and deliberately created such intolerable working conditions that the employee was forced into involuntary resignation." *Plummer v. Marriott Corp.*, 654 So. 2d 843, 849 (La. Ct. App. 1995), writ denied, 660 So. 2d 460 (La. 1995). The extent of the intolerable conditions must lead a reasonable person to feel "compelled to resign." *Id.* "The intolerable conduct must be of a greater severity or pervasiveness than the minimum required to prove a hostile working environment[.]" *Id.* Cold stares, rude conduct, and a transfer to a subjectively less desirable location simply do not meet this high standard, even when viewing Rayborn's allegations in the most favorable light.

Finally, Rayborn's reprimands do not amount to a "significant change in employment status." *Tatum*, 79 So. 3d at 1104 (quoting *Ellerth*, 524 U.S. at 761). Accordingly, Rayborn has failed to show she was subjected to an adverse employment action and her claim under § 23:967 fails.

## II. First Amendment Retaliation

Rayborn brought claims under 42 U.S.C. § 1983 against BPSB, Hughes, and Bourgeois in their official and individual capacities, alleging that they violated Rayborn's rights to "protest, oppose, and report violations of child

welfare, neglect of children, and proper care" under the First Amendment. The district court granted summary judgment against Rayborn on these claims. We address her arguments in two parts.

*A. Claims against BPSB, Hughes, and Bourgeois in their official capacities*

"Municipal liability under 42 U.S.C. § 1983 requires proof of 1) a policymaker; 2) an official policy; 3) and a violation of constitutional rights whose 'moving force' is the policy or custom." *Rivera*, 349 F.3d at 247 (citing *Monell v. Dept. of Soc. Servs.*, 436 U.S. 658, 694 (1978)). "[I]solated unconstitutional actions by municipal employees will almost never trigger liability." *Id.* (internal quotation marks omitted). The district court granted summary judgment in BPSB's favor because it determined Rayborn failed to identify any official school board policy or custom in accordance with which the allegedly unconstitutional conduct occurred.

Before us, Rayborn has failed to identify any policy or custom upon which her transfer was predicated other than to say, "[t]here is no reason to accept" that the actions "were not part of an unwritten practice or custom" of BPSB. Rayborn contends "Hughes told [her] the punishment was a joint decision between [Hughes], Bourgeois, [the] Assistant Superintendent, and others." But this does not show anything more than an isolated incident by municipal employees. The district court did not err in determining that there was no genuine issue of fact as to an underlying municipal policy.

Further, suits against officials in their official capacities "generally represent only another way of pleading an action against an entity of which an officer is an agent." *Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985) (quoting *Monell*, 436 U.S. at 690 n.55). Thus, Rayborn's claims against Hughes and Bourgeois in their official capacities also fail. *See id.* at 166 ("[An official-capacity suit] is *not* a suit against the official personally, for the real party in interest is the entity.").

No. 16-30903

*B. Claims against Hughes and Bourgeois in their individual capacities*

The district court determined that Hughes and Bourgeois were entitled to qualified immunity. "To overcome an official's qualified immunity defense, a plaintiff must show that the evidence, viewed in the light most favorable to him, is sufficient to establish a genuine dispute (1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct." *Cutler v. Stephen F. Austin State Univ.*, 767 F.3d 462, 469 (5th Cir. 2014) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (internal quotation marks omitted)). The district court concluded that Rayborn could not meet her burden as to the first prong of the test.

"[T]he First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006). To determine whether a public employee's speech is entitled to protection, courts undertake a two-step inquiry. The first step "requires determining whether the employee spoke as a citizen on a matter of public concern." *Id.* at 418. "If the answer is no, the employee has no First Amendment cause of action based on his or her employer's reaction to the speech." *Id.* If the answer is yes, then a court must ask whether the "government entity had an adequate justification for treating the employee differently from any other member of the general public." *Id.* The Supreme Court explained, however, that "[a] government entity has broader discretion to restrict speech when it acts in its role as employer, but the restrictions it imposes must be directed at speech that has some potential to affect the entity's operations." *Id.*

Rayborn contends that the notes of her encounters with HDC, in which she detailed the "red flags" that turned Bourgeois and Hughes against her, were subpoenaed in connection with HDC's parents' lawsuit against BPSB and that under Supreme Court precedent those notes should receive First

10

Amendment protection. In *Lane v. Franks*, the Supreme Court considered testimony given by an individual pursuant to a subpoena and concluded: "Truthful testimony under oath by a public employee *outside the scope of his ordinary job duties* is speech as a citizen for First Amendment purposes. That is so even when the testimony relates to his public employment or concerns information learned during that employment." 134 S. Ct. 2369, 2378 (2014) (emphasis added). It was undisputed in *Lane* that "Lane's ordinary job responsibilities did not include testifying in court proceedings." *Id.* n.4. In *Garcetti v. Ceballos*, however, the Supreme Court held that "when public employees make statements *pursuant to their official duties*, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." 547 U.S. at 421 (emphasis added).

Rayborn alleges the following speech is constitutionally protected: notes she made regarding HDC, including her personal observations and documentation of HDC's health and status; the submission and explanation of the notes to her superiors; her conversation with Bourgeois in which she stated that there were "red flags" regarding HDC; her explanation of the red flags; her recounting that she had previously warned the assistant principal about her concerns for the student's health; and her insistence that HDC should be on a section 504 plan. Rayborn argues the district court erred when concluding that her job description and duties as a school nurse required this speech.

The district court correctly concluded that all of Rayborn's actions that she claims are protected by the First Amendment, including offering her notes in accordance with the subpoena requests, were made according to her official duties. The test is not whether she was required to engage in the speech, but rather whether she made the speech "pursuant to [her] 'official responsibilities'" and whether that speech is "ordinarily within the scope of

[her] duties." *Lane*, 134 S. Ct. at 2379 (quoting *Garcetti*, 547 U.S. at 424). The district court observed that Rayborn's job responsibilities were "maintaining complete records on all school nurse activities" and these include "assessment and evaluation of individual student health and behavior patterns; conferences with teachers and parents; and routine follow-up on reported health concerns of students." Rayborn stresses the Supreme Court's caution about over-reliance on written job descriptions, *Garcetti*, 547 U.S. at 424–25, but she fails to create any genuine issue of material fact as to whether this speech was made pursuant to her official duties as school nurse.

Rayborn has not shown that Hughes and Bourgeois violated her first amendment right as an employee "to speak as a citizen addressing matters of public concern." *Id.* at 417. Thus, Hughes and Bourgeois's qualified immunity defense prevails, and Rayborn's § 1983 claim against them fails.

III. Fourteenth Amendment Liberty and Reputational Interests

Rayborn claims that Defendants violated her Fourteenth Amendment rights to her good name, reputation, and integrity. She argues she was subjected to a hostile working environment in which Bourgeois openly mocked her and staff disrespected her. She was reprimanded twice, and, when she was involuntarily removed from Parkway, she was "paraded and escorted out as if she were a common criminal." She could not return to the school her children attended without an escort. She was denied any opportunity to rebut the allegations made against her in either of the reprimands she received because BPSB refused to hold a hearing. As a result, she lost the support of her friends, her church community, and the respect of former colleagues, and she has put her house on the market.

"It is now beyond any doubt that discharge from public employment under circumstances that put the employee's reputation, honor or integrity at stake gives rise to a liberty interest under the Fourteenth Amendment to a

procedural opportunity to clear one's name." *Rosenstein v. City of Dall.*, 876 F.2d 392, 395 (5th Cir. 1989) (collecting cases). The district court correctly noted, however, that "reputation alone [is not] a constitutionally protected interest." *Wells v. Hico Indep. Sch. Dist.*, 736 F.2d 243, 256 (5th Cir. 1984). "This court employs a seven-element 'stigma-plus-infringement' test to determine whether § 1983 affords a government employee a remedy for deprivation of liberty without notice or an opportunity to clear his name." *Bledsoe v. City of Horn Lake*, 449 F.3d 650, 653 (5th Cir. 2006). To succeed on a procedural due process claim under the Fourteenth Amendment, a plaintiff must show the following:

> (1) he was discharged; (2) stigmatizing charges were made against him in connection with the discharge; (3) the charges were false; (4) he was not provided notice or an opportunity to be heard prior to the discharge; (5) the charges were made public; (6) he requested a hearing to clear his name; and (7) the employer denied the request.

*Id.* As discussed above, BPSB never discharged Rayborn. Thus, she cannot meet the first element of the test, and her claim fails.

### IV. Intentional Infliction of Emotional Distress

Finally, Rayborn appeals the district court's grant of summary judgment in favor of Defendants on her claim of intentional infliction of emotional distress. Rayborn argues she was shunned, subjected to two "unfounded" reprimands, involuntarily transferred away from the school her children attended, barred from her children's school, and threatened because "she did the right thing" when she tendered her notes and statements regarding HDC's suicide. As noted by the district court, Rayborn claims to have suffered fibromyalgia, stress, anxiety, and paranoia, and she has lost interest in activities she previously found enjoyable as a result of these actions.

To recover on a claim of intentional infliction of emotional distress in Louisiana, "a plaintiff must establish (1) that the conduct of the defendant was extreme and outrageous; (2) that the emotional distress suffered by the plaintiff was severe; and (3) that the defendant desired to inflict severe emotional distress or knew that severe emotional distress would be certain or substantially certain to result from his conduct." *White v. Monsanto Co.*, 585 So. 2d 1205, 1209 (La. 1991). As the district court correctly noted, "[t]he distress suffered by the employee must be more than a reasonable person could be expected to endure." *Nicholas v. Allstate Ins. Co.*, 765 So. 2d 1017, 1027 (La. 2000). Indeed, the Supreme Court of Louisiana has indicated that liability only rests where "the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* at 1022 (quoting Restatement (Second) of Torts § 46). We agree with the district court that Rayborn failed to show any of the Defendants' conduct was extreme and outrageous or more than a reasonable person could be expected to endure.

## CONCLUSION

For the aforementioned reasons, we AFFIRM the district court on all issues.

14

JAMES L. DENNIS, Circuit Judge, concurring in part and dissenting in part:

Though I concur in the majority opinion as to most of Rayborn's claims, I write separately to explain my disagreement with the majority's resolution of Rayborn's claim under the Louisiana Whistleblower Statute. As the majority identifies, a transfer that is the equivalent of a demotion constitutes an adverse employment action for the purposes of this statute. *See, e.g.*, *Sharp v. City of Hous.*, 164 F.3d 923, 932 (5th Cir. 1999) (discussing plaintiff's federal retaliation claim under 42 U.S.C. § 1983); *see also Haire v. Bd. of Supervisors of La. State Univ.*, 719 F.3d 356, 367 (5th Cir. 2013) (noting that analysis of reprisal under Louisiana Whistleblower statute mirrors that of retaliation claims under federal law); *Tatum v. United Parcel Serv., Inc.*, 79 So. 3d 1094, 1104 (La. 2012) (applying Title VII precedent to define what constitutes a reprisal under Louisiana Whistleblower Statute). The majority also correctly notes that "[t]o be equivalent to a demotion, a transfer need not result in a decrease in pay, title, or grade; it can be a demotion if the new position proves objectively worse—such as being less prestigious or less interesting or providing less room for advancement." *Sharp*, 164 F.3d at 933 (citations omitted).

Though the majority therefore recites the correct standard for when a transfer constitutes an adverse employment action, it errs by failing to consider whether any reasonable jury could find that Rayborn's transfer amounted to a demotion, instead inappropriately drawing its own conclusions from the disputed facts. Whether a transfer amounts to a demotion is a question of fact to be resolved by a jury—not by a judge on summary judgment. *Id.* It is well established that this court, when reviewing a district court's grant of summary judgment, does not weigh evidence or decide issues of disputed

No. 16-30903

fact. *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014). Instead, we draw all reasonable inferences in favor of the non-movant and determine only whether any reasonable jury presented with that evidence could find in her favor. *Id.*

It is clear from the record that Rayborn has created a genuine dispute of fact on this issue. Rayborn provided summary judgment evidence that she was reassigned as a disciplinary measure to nursing facilities that were unclean, devoid of safe disposal for used needles, and that lacked the space, equipment, and privacy to provide adequate medical care to her students. Though she did not suffer a decrease in pay, she contends that these conditions prevented her from fully exercising her nursing skills or generally succeeding in her position. Rayborn's evidence that her new position was objectively worse than her prior position is just as strong as that in other cases in which we found that transfers without reductions in salary were adverse employment actions. *See Sharp*, 164 F.3d at 926, 928, 933 (jury could conclude that Plaintiff's transfer was a demotion in light of evidence that her initial assignment to the horse-mounted law enforcement unit was more "elite" than her subsequent assignment to a "less prestigious" teaching post at the Police Academy); *Click v. Copeland*, 970 F.2d 106, 110 (5th Cir. 1992) (jury could find that intradepartmental transfer without a reduction in salary was a retaliatory demotion based on evidence that the new position was "not as interesting or prestigious" and "few people transferred voluntarily" to the new position); *c.f. Mitchell v. Univ. of La. Syst.*, 154 F. Supp. 3d 364, 378–80, 404–05 (M.D. La. 2015) (reasonable jury could find that transfer to a different programmer analyst position within the university was a demotion based on Plaintiff's evidence that her new work environment was dysfunctional and she was required to perform more secretarial rather than "higher level" tasks, even though she kept the same pay and Defendant called it a "lateral move"). A reasonable jury, presented with Rayborn's evidence that she was transferred as punishment to a new

position that was objectively worse due to specific, concrete deficiencies that interfered with her work could conclude that Rayborn suffered an adverse employment action.

Accordingly, I would hold that summary judgment on this issue was improper and would vacate the district court's dismissal of Rayborn's claim under the Louisiana Whistleblower Statute and remand for further proceedings.